*Prince George's County v. Robert E. Thurston Jr., et al.*, No. 63, September Term, 2021. Opinion by Getty, C.J.

**CHARTER FOR PRINCE GEORGE'S COUNTY — COUNCILMANIC DISTRICTS — REDISTRICTING COMMISSION PLAN**

The Court of Appeals held that Article III, § 305 of the Charter for Prince George's County ("Charter") requires the Prince George's County Council ("Council"), if it chooses to adopt the plan of the redistricting commission, to do so by resolution upon notice and public hearing. That provision does not authorize the Council to change the redistricting commission's proposal and enact an alternative redistricting plan by resolution. For the Council to enact a councilmanic districting plan different from the plan proposed by the redistricting commission, the Council must use a "bill" to pass a "law," subject to presentment to the County Executive and executive veto.

Accordingly, where the Prince George's County 2021 Redistricting Commission ("2021 Commission") transmitted its redistricting plan and report to the Council on September 1, 2021 and the Council failed to pass a law changing the 2021 Commission's proposal, the 2021 Commission's plan became effective by operation of law on November 30, 2021.

IN THE COURT OF APPEALS

OF MARYLAND

No. 63

September Term, 2021

---

PRINCE GEORGE'S COUNTY

v.

ROBERT E. THURSTON JR., ET AL.

---

*Getty, C.J.
Watts,
Hotten,
Booth,
Biran,
Gould,
McDonald, Robert N.
  (Senior Judge, Specially Assigned)

JJ.

---

Opinion by Getty, C.J.

---

Filed: July 13, 2022

*Getty, C.J., now a Senior Judge, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to Md. Const., Art. IV, § 3A, he also participated in the decision and adoption of this opinion.

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

A "resolution," in the legislative context, can mean many things. In the halls of the United States Congress, there exist three forms of resolutions: joint, concurrent, and simple.[1] On State Circle in Annapolis, the Maryland General Assembly employs resolutions in similar fashion: joint resolution, simple resolution, and resolution.[2] Each of these legislative tools serve a distinct purpose ranging from expressing appreciation or congratulation to embracing matters of substance and public policy. In Prince George's County, there exists only one kind: a "resolution," defined in the Charter for Prince George's County ("Charter") to "mean a measure adopted by the [Prince George's County] Council having the force and effect of law but of a temporary or administrative character." Art. X, § 1017(c).

In this case, as we shall explain, the Prince George's County Council ("Council") appointed the Prince George's County 2021 Redistricting Commission ("2021 Commission") to prepare and propose a councilmanic redistricting plan following receipt of the 2020 federal decennial census data. The 2021 Commission transmitted its proposed plan and report to the Council on September 1, 2021. The Council, after considering the 2021 Commission's plan, attempted to enact an alternative redistricting

---

[1] *See Bills & Resolutions*, United States House of Representatives, https://www.house.gov/the-house-explained/the-legislative-process/bills-resolutions, archived at https://perma.cc/5UTD-9T5H; *Types of Legislation*, United States Senate, https://www.senate.gov/legislative/common/briefing/leg_laws_acts.htm, archived at https://perma.cc/G8X8-D5VL.

[2] *See* Maryland House Rule 25, Regular Session 2022; Senate of Maryland Rule 25, Regular Session 2022.

plan using a resolution. *See* CR-123-2021 ("Council Resolution 123").[3] Robert E. Thurston, Jr. and others ("Respondents") challenged Council Resolution 123 in the Circuit Court for Prince George's County. The circuit court invalidated the measure and Prince George's County ("County") noted an appeal.

We hold that, for the Council to enact a councilmanic districting plan different from the plan proposed by the appointed redistricting commission, Article III, § 305 of the Charter requires the Council to use a "bill" and pass a "law." The Council is prohibited from enacting an alternative redistricting plan by resolution. Therefore, because the Council passed no other law changing the 2021 Commission's proposal, the 2021 Commission's plan became effective by operation of law on November 30, 2021.

## BACKGROUND

### A. *Charter for Prince George's County*

Pursuant to Article XI-A of the Constitution of Maryland (the "Home Rule Amendment"), the citizens of Prince George's County adopted a charter form of government in November 1970.[4] Md. Const. art. XI-A, § 2 ("The General Assembly shall

---

[3] Throughout this Opinion, we shall refer to various bills and resolutions passed by the Council. Our citations conform to the numbering conventions used by the Council: "Every bill and resolution shall be consecutively numbered beginning with CB-1-(year) for Council bills and CR-1-(year) for Council resolutions." Rule 10.3, *Bills and Resolution Numbers*, Rules of Procedure for the Prince George's County Council (July 2020), ("Rules of Procedure") at 12, https://pgccouncil.us/DocumentCenter/View/5503/County-Council-Rules-of-Procedure?bidId=, archived at https://perma.cc/EMJ2-PK8J.

[4] When Prince George's County adopted a charter form of government in 1970, it became the sixth Maryland county to do so, following Montgomery (1948), Baltimore (1956), Anne Arundel (1964), Wicomico (1964), and Howard (1968). In the years since 1970, five

by public general law provide a grant of express powers for such County or Counties as may thereafter form a charter under the provisions of this Article.").

The Charter is divided into twelve articles, each of which addresses a different aspect of County government. Article III governs the legislative branch—the Council. The Council is composed of eleven members, nine of whom are elected from geographic districts, and two of whom serve as at-large members. Prince George's County Charter, Art. III, §§ 301; 304.

*1.    General Provisions*

The Council "shall enact no law except by bill." Prince George's County Charter, Art. III, § 317. A "bill," as defined in the Charter, "mean[s] any measure introduced in the Council for legislative action." *Id.* at Art. X, § 1017(a). The Charter also refers to a "bill" that has been enacted in conformance with the Charter as either an "act," "ordinance," "public local law," or "legislative act." *Id.* at Art. X, § 1017(b). By contrast, a "resolution" is defined as "a measure adopted by the Council having the force and effect of law but of a temporary or administrative character." *Id.* at Art. X, § 1017(c). The Charter defines "law"

> as including all acts, public local laws, ordinances, and other legislative acts of the Council, all ordinances and resolutions of the County Commissioners not hereby or hereafter amended or repealed, and all public general laws and public local laws of the General Assembly in effect from time to time

other Maryland counties have adopted a charter form of government: Harford (1972), Talbot (1973), Dorchester (2002), Cecil (2012), and Frederick (2014).

3

after the adoption of this Charter, whenever such construction would be reasonable.

*Id.* at Art. X, § 1017(d).

*2.* *Redistricting Procedure*

Every ten years, following the release of the federal decennial census data, the councilmanic districts are redrawn. When councilmanic redistricting coincides with Maryland's quadrennial election in the second year of a decade—for example, 2022—the geographic districts remain in effect for three full county election cycles—2022, 2026, and 2030. Following the 2020 decennial census, and after "COVID-19-related delays," the United States Census Bureau released the results to the fifty states on August 12, 2021.[5] In Prince George's County, this new census data provided the basis for redistricting in this case.

Article III, § 305 of the Charter[6] sets out a redistricting procedure by which councilmanic districts are redrawn to be "compact, contiguous, and equal in population." By February 1 of the year before redistricting becomes effective, the Council must appoint a "commission on redistricting." Art. III, § 305. The central committee of each political party that polled at least fifteen percent of the total vote cast in the preceding regular Council election may propose five names to the Council for appointment to the redistricting

---

[5] *2020 Census Timeline of Important Milestones*, United States Census Bureau, https://www.census.gov/programs-surveys/decennial-census/decade/2020/planning-management/release/timeline.html, archived at https://perma.cc/6GCF-DSET.

[6] All references to "§ 305" are to Article III, § 305 of the Charter, unless otherwise indicated.

4

commission. *Id.* The redistricting commission is then composed of two members from each list and one additional member appointed by the Council to serve as chairman. *Id.*

By September 1 of the year before redistricting becomes effective, the redistricting commission "shall prepare, publish, and make available a plan of Council districts and shall present that plan, together with a report explaining it, to the Council." Prince George's County Charter, Art. III, § 305. After the Council receives the redistricting commission's plan, it must hold a public hearing. *Id.* The public hearing must occur no less than fifteen calendar days, and no more than thirty calendar days, after the Council receives the plan. *Id.*

"If the Council passes no other law changing the proposal, then the plan, as submitted, shall become law, as of the last day of November, as an act of the Council, subject to Sections 320 and 321 of [the] Charter." Prince George's County Charter, Art. III, § 305. In 2012, the citizens of Prince George's County ratified an amendment to § 305, adding a single sentence to the conclusion of § 305: "Such law shall be adopted by resolution of the County Council upon notice and public hearing." *Id.*; *see* CB-55-2012.

**B.     *Prince George's County Council 2022 Redistricting***

In the Council election immediately preceding the regular election, only the Democratic Party polled at least fifteen percent of the total vote cast. Therefore, in accordance with § 305, only one central committee—the Prince George's County Democratic Central Committee ("Democratic Central Committee")—proposed a list of

5

names to be considered for appointment to the 2021 Commission.[7]  The Democratic Central Committee proposed a list of five names to the Council.  By resolution on January 28, 2021, the Council appointed three individuals to the 2021 Commission—David C. Harrington and Dr. Charlene Dukes, from the Democratic Central Committee's list, and Rev. James J. Robinson as Chair.  *See* CR-006-2021, at 1; App'x A.

The 2021 Commission conducted eleven public meetings, held two public hearings, gathered public input using electronic outreach efforts, and created a redistricting website that contained information on the redistricting process, timelines, agendas, meeting minutes, census data, public comments, briefings, preliminary plan proposals, and final plan proposals.  *See* CR-123-2021, at 1–2.  On September 1, 2021, the 2021 Commission transmitted its redistricting plan and accompanying report ("2021 Commission Plan and Report") to the Council.  *See Plan and Report*, Prince George's County 2021 Redistricting Commission, https://pgccouncil.us/DocumentCenter/View/6648/2021-Redistricting-Commission-Report, archived at https://perma.cc/7854-45YM.

The Council considered the 2021 Commission Plan and Report during a public hearing on September 28, 2021.  *See* CR-123-2021, at 2.  Following the public hearing, on October 12 and October 14, 2021, the Council conducted public work sessions to consider the 2021 Commission Plan and Report and create an alternative redistricting plan.  *See id.*

---

[7] Because only the Democratic party polled fifteen percent of the total vote cast in the preceding election, the commission consisted of three members instead of five.  If any other party polled fifteen percent or more of the total vote cast in the preceding election, that party would also have submitted to the Council a slate of names to be considered for appointment, from which two individuals would have been appointed to the redistricting commission.

The Council, sitting as the Committee of the Whole,[8] received and favorably voted its alternative plan out of committee on October 14, 2021. *See id.* The Council amended the alternative plan on October 19, 2021 and introduced the same plan in two forms: CB-115-2021 ("Council Bill 115") and Council Resolution 123. As reflected in the Council's October 19, 2021 Meeting Minutes, "[t]he Chair announced that [Council Bill 115] was removed from the agenda as not necessary due to the introduction of [Council Resolution 123.]" The Council took no further action on Council Bill 115.

After a public hearing on November 16, 2021, the Council adopted Council Resolution 123 by a six-to-three vote. Council Resolution 123 directed the Clerk of the Council to transmit a copy of the councilmanic districting plan contained therein to the Prince George's County Board of Elections.

## C.    *Proceedings in the Circuit Court for Prince George's County*

Respondents sought a Temporary Restraining Order and Preliminary Injunction to enjoin the use of Council Resolution 123 by filing a complaint titled "(Emergency) Verified Complaint for Declaratory Judgment and Writ of Mandamus and for a Temporary Restraining Order and Preliminary Injunctive Relief" in the Circuit Court for Prince George's County on January 24, 2022.

---

[8] The Council, pursuant to the County Council Rules of Procedure, operates by self-imposed committee system. *Committee System*, Prince George's County Council, https://pgccouncil.us/189/Committee-System, archived at https://perma.cc/F96H-KWBJ. Under this system, "[a]t the time of presentation of a bill or at the introduction of a resolution, the Chair may refer the matter to [a] standing committee[] or to the Council sitting as a Committee of the Whole." *Id.*

7

The circuit court set the matter for a hearing on the Temporary Restraining Order ("TRO") on January 28, 2022 ("January 28 Hearing"). At the outset of the hearing, counsel for the County made clear that the County did not dispute Respondents' factual allegations as described in the Complaint. Accordingly, the circuit court converted the January 28 Hearing from one concerning the TRO to a trial on the merits and the parties' arguments focused on the legal question of whether the Council's actions violated § 305.

Following the January 28 Hearing, the circuit court issued an Order of Court and Declaratory Judgment on January 31, 2022 ("January 31 Order"). The circuit court declared Council Resolution 123 ineffective "to the extent it[] . . . serve[d] as a 'law changing the [2021 Commission's plan]'"; because the Council did not pass any other law changing the 2021 Commission's plan, the circuit court determined that "the [2021] Commission's plan became law on November 30, 2021[.]"

Further, the January 31 Order: (1) "permanently enjoined [the County] from acting upon, implementing, or otherwise presenting the redistricting plan in [Council Resolution 123] to any entity charged with acting upon or implementing the County's redistricting plan"; (2) required that the County "immediately withdraw the redistricting plan in [Council Resolution 123] and submit the [2021] Commission's plan to all entities charged with acting upon or implementing the County's redistricting plan"; and (3) required that the County "immediately cease and desist any publication of the redistricting plan in [Council Resolution 123] or otherwise withdraw the plan in [Council Resolution 123] from public view to the extent practicable and within its control[.]"

8

### D. *Appeal*

The County noted an appeal of the circuit court's January 31 Order on February 1, 2022. The Court of Special Appeals of Maryland docketed the appeal on February 3, 2022. While pending in that court, the County filed in this Court a petition for writ of *certiorari*, which posed the following question:

> Is a Resolution, having the force and effect of law, a valid measure to adopt a decennial County Redistricting Plan?

This Court granted the petition on February 11, 2022, established an expedited briefing schedule, and heard oral argument on March 4, 2022.[9] *Prince George's Cty. v. Thurston*, 477 Md. 383 (2022). By per curiam order issued March 7, 2022, this Court affirmed the circuit court's January 31 Order in all respects and further ordered

> that the redistricting plan prepared by the [2021] Commission and submitted to the Council on September 1, 2021, which became effective by operation of law under Section 305 of the Charter for Prince George's County on November 30, 2021, shall be used for all purposes in acting upon or implementing the County's redistricting plan[.]

*Prince George's Cty. v. Thurston*, 477 Md. 629 (2022). This Opinion explains our rationale.

---

[9] The County filed an "Emergency Motion for Expedited Consideration and Relief of the Petition for a Writ of Certiorari" on February 8, 2022 (the "Emergency Motion"). Respondents filed an "Answer to the Petition for Writ of Certiorari and Request for Summary Affirmance" and "Response to [Prince George's County's] Motion to Expedite" on February 9, 2022.

The Court's February 11 Order granting *certiorari* granted in part and denied in part the County's Emergency Motion, denied the County's request for a stay of the circuit court's January 31 Order, and denied Respondents' request for a summary affirmance.

**STANDARD OF REVIEW**

The underlying facts of this case are not at issue. During the proceedings in the circuit court, counsel for the County did not challenge the factual basis alleged in the complaint and the parties limited argument to the legal interpretation of § 305. The circuit court found in its January 31 Order that "the operative facts are not in dispute." We agree.

The issue before this Court—the interpretation of § 305—is a question of law, which we review *de novo*. *Johnson v. State*, 467 Md. 362, 371 (2020) (citation omitted). We give no deference to the circuit court in determining whether its declaratory judgment is correct as a matter of law. *Long Green Valley Ass'n v. Bellevale Farms, Inc.*, 432 Md. 292, 311 (2013) (citing *Atkinson v. Anne Arundel Cty.*, 428 Md. 723, 741 (2012)).

**DISCUSSION**

A county charter is often likened to a local constitution. *See, e.g.*, *Save Our Streets v. Mitchell*, 357 Md. 237, 248 (2000) (collecting cases); *Cheeks v. Cedlair Corp.*, 287 Md. 595, 606 (1980) (alterations in *Cheeks* omitted) ("'A charter' . . . is, in effect, a local constitution[,] which forms the framework for the organization of the local government[.]"). As Chief Judge Robert C. Murphy once put it, writing for the Court in *Cheeks*, "[i]t is the organic, the fundamental law, establishing basic principles governing relationships between the government and the people, and among the various governmental branches and bodies." 287 Md. at 607. With this in mind, we turn to the County's foundational document: the Charter.

### A. *Interpreting Article III, § 305 of the Charter for Prince George's County*

The canons of construction used to interpret statutory language apply with equal force to the interpretation of a charter provision. *Cherry v. Mayor & City Council of Balt. City*, 475 Md. 565, 598 (2021) (citation omitted) ("We construe local ordinances and charters under the same canons of statutory construction as we apply to statutes."). The Court's primary objective is to ascertain the purpose and intent of the charter's framers. *Berry v. Queen*, 469 Md. 674, 687 (2020); *O'Connor v. Balt. Cty.*, 382 Md. 102, 113 (2004). Because we assume that the framers express their intent in the text of the charter, we principally focus on the plain language of the challenged provision as the "primary source of legislative intent." *O'Connor*, 382 Md. at 113 (citation and internal quotation marks omitted); *see also Neal v. Balt. City Bd. of Sch. Comm'rs*, 467 Md. 399, 415 (2020) (citation omitted); *Cherry*, 475 Md. at 598.

To discern legislative intent, we first assign the words of the charter provision their "ordinary and natural meaning." *120 W. Fayette St., LLLP v. Mayor & City Council of Balt. City*, 413 Md. 309, 331 (2010) (quoting *O'Connor*, 382 Md. at 113). This Court "will not 'divine a legislative intention contrary to the plain language'" of the charter provision "or judicially insert language to impose exceptions, limitations[,] or restrictions" not evident in the plain language. *O'Connor*, 382 Md. at 113 (quoting *Langston v. Langston*, 366 Md. 490, 515 (2001)).

The specific provision at issue must be read in the context of the charter and in relation to other charter provisions. *120 W. Fayette St., LLLP*, 413 Md. at 331 (citation omitted); *Howard Rsch. & Dev. Corp. v. Concerned Citizens for Columbia Concept*, 297

11

Md. 357, 364 (1983). We seek "to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory." *Neal*, 467 Md. at 415 (quoting *Brown v. State*, 454 Md. 546, 551 (2017)).

*1.    Plain Language*

Abiding by these canons, we begin with the plain language of § 305. Our focus concerns the concluding portion of § 305, which addresses what occurs after the Council receives a redistricting proposal from the redistricting commission. The provision, as it exists today, provides in pertinent part:

> If the Council passes no other law changing the proposal, then the plan, as submitted, shall become law, as of the last day of November, as an act of the Council, subject to Sections 320[10] and 321[11] of this Charter. Such law shall be adopted by resolution of the County Council upon notice and public hearing.

Art. III, § 305.

---

[10] Article III, § 320, which requires the Council publish all laws and Charter amendments, states in full: "The Council shall cause all laws and all amendments to this Charter to be published promptly following their enactment as provided by law. Such laws and Charter amendments shall also be made available to the public at reasonable prices to be fixed by the Council."

[11] Article III, § 321, which requires the Council to periodically compile and codify all laws in effect, states in full:

> At intervals not greater than every four years, the Council shall compile and codify all laws of the County in effect at such times. Each such codification shall be submitted to the Council, and, if adopted by law, shall be known as the "Prince George's County Code." Such code shall be published with an index and such appropriate notes, citations, annotations, and appendices as the Council may determine. At least annually the Council shall prepare and publish a Supplement to the County Code of laws.

The County contends that the circuit court's interpretation of § 305 runs afoul of basic tenets of statutory interpretation. In the County's view, § 305 should be reconciled and harmonized with Article X, § 1017—the Charter provision that defines terms such as "bill," "act," "resolution," "enactment," and "law." The purported failure to do so, the County asserts, led the circuit court to err in two ways: first, by declining to read the Charter as a whole, instead narrowly focusing on the challenged provision; and second, by failing to interpret the Charter such that "no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory." *Neal*, 467 Md. at 415 (citation omitted). The County argues that if the Council intends to enact an alternative redistricting plan different from that submitted by the redistricting commission, the last sentence of § 305 requires the Council to do so "by resolution upon notice and public hearing."

Respondents counter that § 305, read plainly in conformity with the canons of statutory interpretation and common grammatical principles, leads to a different result. Under Respondents' reading, "such law" in the final sentence of § 305 refers to "the plan, as submitted" by a redistricting commission and not an "other law" passed by the Council to change a redistricting commission's proposal.

Urging us to reach this conclusion, Respondents point to the "last preced[ent] antecedent rule," which finds support in *Board of Supervisors of Elections v. Weiss*, 217 Md. 133 (1958). There, this Court relied on an intermediate appellate court decision from California for the proposition that the word "'[s]uch' is a relative adjective referring back to and identifying something previously spoken of. It naturally, by grammatical usage,

13

refers to the last precedent antecedent." *Id.* at 138 (quoting *In re Wallace's Est.*, 219 P.2d 910, 913 (Cal. Dist. Ct. App. 1950)).

Black's Law Dictionary describes this principle as the "rule of the last antecedent": "[t]he doctrine that a pronoun, relative pronoun, or relative adjective generally refers to the nearest reasonable antecedent." *Rule of the Last Antecedent*, Black's Law Dictionary 1598 (11th ed. 2019).[12] Defined another way, the rule of the last antecedent is "[a]n interpretive principle by which a court determines that qualifying words or phrases modify the words or phrases immediately preceding them and not words or phrases more remote, unless the extension is necessary from the context or the spirit of the entire writing." *Id.* We find this canon instructive; it elucidates the common understanding of the challenged provision.

The words "[s]uch law" refer to the immediately-preceding antecedent "law" contained in the previous sentence: "shall become law." Art. III, § 305. That "law" is easily identifiable; it is "the plan, as submitted" by the redistricting commission. *Id.* We reject the County's argument that "such law" hopscotches over the natural antecedent and somehow refers to the "other law" clause, permitting the Council to change the plan of the redistricting commission.

---

[12] The rule of the last antecedent often invokes the related "nearest-reasonable-referent canon." Black's Law Dictionary explains: "'last antecedent' denotes a noun or noun phrase referred to by a pronoun or relative pronoun—since grammatically speaking, only pronouns are said to have antecedents." *Rule of the Last Antecedent*, Black's Law Dictionary 1598 (11th ed. 2019). "But in modern practice, and despite the misnomer, it is common to refer to the *rule of the last antecedent* when what is actually meant is the *nearest-reasonable-referent canon*." *Id.* (emphasis in original).

14

Put conversely, once the redistricting commission prepares and transmits its plan and report to the Council, the Council is authorized to pass an "other law" changing the proposal. In the absence of the Council passing an "other law," the plan submitted by the redistricting commission "become[s] law . . . as an act of the Council . . . ." Art. III, § 305. When this occurs—either because the Council supports the plan proposed by the redistricting commission or the Council fails to pass a law changing the proposal by the deadline established in § 305—the Council must "adopt[] by resolution" the redistricting commission's plan "upon notice and public hearing." *Id.*

The use of a resolution in this manner is for precisely the reason explained by Respondents—the formal adoption of a resolution creates a public record memorializing the "act of the Council." It avoids the problem encountered in 1991 and 2001, before the Council amended § 305 to its present version. A search of the Council's "Legislative/Zoning Information System" for the years 1991 and 2001 only returns results for the resolutions used to appoint members of the redistricting commission for that year. *See* CR-8-1991; CR-5-2001. In both of those years, the Council did not pass a law changing the redistricting commission's plan and the proposal became law. However, because the Council never took legislative action on the redistricting commission's plan, no record exists of the plan becoming law in either year.

In all, the plain language of § 305 requires the Council, if it chooses to adopt the plan of the redistricting commission, to do so by resolution upon notice and public hearing. The plain language does not require—or even authorize—the Council to enact an alternative redistricting plan by resolution.

15

*2.      What's in a Name?*

"What's in a name?  That which we call a rose [b]y any other name would smell as sweet."  *Romeo and Juliet*, Act II, Scene II, lines 43–44.  Counsel for the County invoked this famed literary reference at oral argument to suggest that the Charter's broad definition of the term "bill" does not limit "what [a] bill is," and could encompass a resolution as a law changing the redistricting commission's proposal.  The County's position on this point is untenable.  For the Council to enact an alternative redistricting plan, it had to pass a "law," which begins as a "bill."[13]  We agree with the circuit court that "a resolution, while having the effect of law, is not a substitute for a law."

The Charter establishes a procedure for the enactment of legislation and provides in pertinent part that "[t]he Council shall enact no law except by bill."  Art. III, § 317.  A "bill," is "any measure introduced in the Council for legislative action"; whereas a "resolution," is "a measure adopted by the Council having the force and effect of law *but of a temporary or administrative character*."  Art. X, § 1017(a); (c) (emphasis added).  The difference between these legislative tools is borne out in prior decisions of this Court.  Describing the difference between an "ordinance," a term encompassed in the definition of

---

[13] The County points to Article X, § 1017(d), which defines "law," as "including all . . . resolutions of the County Commissioners . . . ."  This hardly supports the County's position.  The County emphasizes the word "resolutions" but seemingly ignores "of the County Commissioners."  Read as drafted, the term "law" in the Charter incorporates resolutions of the County Commissioners—the legislative body predating the Council—not resolutions of the Council.

16

"bill," and "resolution"—in the context of the Howard County Charter, which substantively mirrors the definitional provisions contained in the Charter implicated here—we explained:

> A resolution "ordinarily denotes something less solemn or formal than, or not rising to the dignity of, an ordinance." A resolution passed by a legislative body "deals with matters of a special or temporary character . . . [and] generally speaking, is simply an expression of opinion or mind concerning some particular item of business coming within the legislative body's official cognizance, ordinarily ministerial in character and relating to the administrative business of the municipality."

*Kendall v. Howard Cty.*, 431 Md. 590, 596 (2013) (alterations in original) (quoting *Inlet Assocs. v. Assateague House Condo. Ass'n*, 313 Md. 413, 427–28 (1988)).

These definitions demonstrate that the use of a "resolution" is circumscribed to matters where the Council's action is "temporary" or "administrative." The County suggests that this distinction supports its position because redistricting "is best characterized as ministerial in character and relating to the administrative business [of the Council]—i.e.[,] the Council's legal obligation to implement and administer decennial redistricting . . . ." However, the creation and revision of councilmanic districts cannot be said to be either temporary or administrative in nature. This once-a-decade occurrence affects the selection of elected representatives acting on behalf of the citizens of Prince George's County.

Reading § 305 in the context of these Charter provisions does not change our analysis of the plain language. Still, we turn to the legislative history behind § 305.

3.     *Legislative History*

The Council thrice amended § 305—once each in 1974 (CB-92-1974), 2002 (CB-69-2002) (the "2002 Amendment"), and 2012 (CB-55-2012) ("Council Bill 55" or the

17

"2012 Amendment").[14]  In each instance, Prince George's County voters subsequently ratified the amendments.

On recommendation of the Charter Review Committee, the Council amended § 305 in 1974 to add internal references to Article III, §§ 320 and 321.[15]  The 2002 Amendment altered the portion of § 305 that enabled the redistricting commission's plan to become law in the absence of an "other law" passed by the Council.  The amendment modified the triggering event from a time span to a fixed calendar day.  Instead of a seventy-day period, upon which the redistricting commission's plan would become law absent Council action, the 2002 Amendment added language such that if "the Council passes no other law changing the proposal" the redistricting commission's plan becomes law "as of the last day of November."  *See* CB-69-2002.

The 2002 Amendment further modified the deadlines by which the Council and redistricting commission must complete various steps of the redistricting process.  Following ratification of the 2002 Amendment, in the year before redistricting is to take effect, the Council must appoint the redistricting commission by February 1 and the redistricting commission must prepare and publish its plan by September 1.

---

[14] This Court's February 11, 2022 Order granting *certiorari* ordered "that the parties . . . include, in the record extract or in appendices to their briefs, the relevant legislative history concerning §§ 305 and 317 of the Prince George's County Charter[.]" The legislative history of the charter provisions discussed herein is derived in significant part from the Appendix that accompanied the County's opening brief.

[15] More precisely, the 1974 amendment added the following language: "as an act of the Council, subject to Sections 320 and 321 of this charter."  *See* CB-92-1974 at 2.

Our focus in this case lies with the 2012 Amendment, to which we now turn. On June 19, 2012, Council Chair Andrea Harrison and Council Member Ingrid Turner introduced Council Bill 55, a charter amendment bill that sought to add a single sentence to the end of § 305: "[s]uch law shall be adopted by resolution of the County Council upon notice and public hearing." *See* CB-55-2012 at 1–2. The Council's Committee of the Whole considered the legislation the same day, as described by the Council's June 19 Agenda Minutes:

> **CB-55-2012 (CHARTER AMENDMENT) - AN ACT CONCERNING AMENDMENT OF SECTION 305, CHARTER OF PRINCE GEORGE'S COUNTY** for the purpose of proposing an amendment to Section 305 of the Charter of Prince George's County to authorize legislative action on the decennial County Council redistricting plan by resolution upon notice and public hearing. ***FAVORABLE RECOMMENDATION***
>
> *Karen Zavakos, Legislative Officer, provided an overview of the Legislation. Council Member Olson moved favorable recommendation; seconded by Council Member Davis. The motion carried 7-0 (Absent: Council Members Campos and Turner).*

County Council of Prince George's County, June 19, 2012 Agenda Minutes ("June 19 Agenda Minutes"), at 21 (bold and italics in original). After the Committee of the Whole favorably reported the legislation, the Council scheduled a public hearing for Tuesday, July 24, 2012. *Id.* at 23.

The Council's July 24 Agenda Minutes memorialize the remaining legislative action concerning the 2012 Amendment:

> **CB-55-2012 (CHARTER AMENDMENT) - AN ACT CONCERNING AMENDMENT OF SECTION 305, CHARTER OF PRINCE GEORGE'S COUNTY** for the purpose of proposing an amendment to Section 305 of the Charter of Prince George's County to authorize legislative

19

action on the decennial County Council redistricting plan by resolution upon notice and public hearing. ***PUBLIC HEARING HELD; ENACTED***

(Introduced by Council Members Harrison and Turner on 6/10/2012;[16] favorably reported out of [the Committee of the Whole] on 6/19/2012)

**(6 VOTES REQUIRED TO ENACT)**

*Pursuant to proper notice, the public hearing convened on Council Bill 55. No persons wishing to speak, the public hearing was declared held. Council Member Turner moved enactment of Council Bill 55; seconded by Council Member Davis. The motion carried 8-0 (Absent: Council Member Toles).*

County Council of Prince George's County, July 24, 2012 Agenda Minutes ("July 24 Agenda Minutes"), at 18 (bold and italics in original).

The Council adopted the 2012 Amendment by an affirmative vote of two-thirds of the members of the full Council on July 24. The proposed amendment appeared on the 2012 General Election ballot in Prince George's County as "Question A": whether "[t]o authorize legislative action on the decennial County Council redistricting plan by resolution upon notice and public hearing." *See* CR-25-2012 at 2. Prince George's County voters answered in the affirmative and ratified the 2012 Amendment on November 6.

We acknowledge that the available legislative history concerning § 305 is minimal. A review of the limited materials that are available, especially concerning the 2012 Amendment, does nothing to reveal an intent contrary to that embodied by the plain

---

[16] Presumably, the notation that Council Members Harrison and Turner introduced Council Bill 55 on June 10, 2012, and not June 19, 2012, is a scrivener's error. All other references in the legislative history indicate that June 19, 2012 is the date of introduction to the Council.

20

language of the provision.  Respondents agree and argue that nothing in the legislative history supports the County's reading of § 305.

Yet, the County argues that the circuit court erred by failing to consider the legislative history of the 2012 Amendment.  Pressing this argument, the County clings to a single sentence appearing in the "Background Information" section of the Council's "Agenda Item Summary"[17] accompanying Council Bill 55 on June 19, 2012 and July 24, 2012: "This proposed Charter Amendment authorizes the adoption of a County Council redistricting plan by resolution upon notice and public hearing."  This lone sentence and the other existing legislative history, however, do not persuade us that the County's interpretation is correct.

To read it as the County urges would disregard the other numerous indications contained in the legislative history that the 2012 Amendment intended to "authorize legislative action on the decennial County Council redistricting plan by resolution upon notice and public hearing."  Though similar to the language cited by the County, this language is more descriptive as to the true intent of the 2012 Amendment.  And, more importantly, this language appears in the purpose paragraph[18] of Council Bill 55 and

---

[17] Rule 10.4 of the Council's rules provides that "[e]ach bill, resolution[,] or other matter to be placed on the Council Agenda shall be accompanied by a completed Agenda Item Summary prepared on a form maintained by the Clerk."  Rule 10.4, *Agenda Item Summary*, Rules of Procedure, at 12.  The form contains the pertinent information about an action of the Council, such as the sponsors, prior Council action, remarks, background information, and a fiscal impact statement.

[18] The purpose paragraph, a component of legislation often beginning with language such as "for the purpose of," describes the function of the legislation and "provides insight into legislative intent."  *Berry*, 469 Md. at 702 (citing *Duffy v. CBS Corp.*, 458 Md. 206, 229

21

mirrors the language included on the ballot when proposed to Prince George's County voters for approval or rejection.

The language contained in Council Bill 55's purpose paragraph and included on the ballot is telling. It makes clear that the subject of the 2012 Amendment is "the decennial County Council redistricting plan." In the context of § 305—the purpose of which is to establish a redistricting commission tasked with redrawing council districts—the redistricting commission's plan is *the plan* subject to "legislative action . . . by resolution upon notice and public hearing." The legislative history of the 2012 Amendment gives this Court no reason to believe the Council's alternative redistricting plan, if the Council chooses to disregard or change the redistricting commission's proposal, can be enacted by resolution instead of bill.

Reading the 2012 Amendment in this way is logical. If the Council chooses to adopt the plan as presented by the redistricting commission, the 2012 Amendment requires the Council to notify the public, hold a public hearing, and adopt the plan by resolution. Doing so serves to inform the public and create a legislative record of the Council's action. The County contends that since the redistricting commission's plan "shall become law, as of

_____

(2018)). This Court occasionally examines purpose paragraphs to confirm our plain language interpretation. *See e.g.*, *id.* (emphasis in original) (confirming that the language "for the purpose of *clarifying*" in a bill's purpose paragraph indicated loss of use damages had always been a component of damage to property as incorporated by Maryland's Uninsured Motorist Stature); *Blackstone v. Sharma*, 461 Md. 87, 129–30 (2018) (confirming that the language "for the purpose of altering" in a bill's purpose paragraph indicated that the General Assembly meant to modify the definition of collection agencies as it related to licensing and regulation of such entities under the Maryland Collection Agency Licensing Act); *Duffy*, 458 Md. at 229; *Johnson v. Mayor & City Council of Balt.*, 430 Md. 368, 389 (2013); *Chesek v. Jones*, 406 Md. 446, 462 (2008).

22

the last day of November," if the Council does not pass an "other law changing the proposal," it is "illogical and nonsensical" for the Charter to require a resolution adopting that which automatically occurs. We disagree; the effect of the 2012 Amendment memorializes the Council's decision to adopt the redistricting commission's plan as its own.

Therefore, we hold that § 305 of the Charter requires the Council, if it chooses to adopt the plan of the redistricting commission, to do so by resolution upon notice and public hearing. It does not, however, require or authorize the Council to change the redistricting commission's proposal and enact an alternative redistricting plan by resolution.

Applying this interpretation to the facts here, the 2021 Commission transmitted its redistricting plan and report to the Council on September 1, 2021. The Council introduced Council Bill 55 but failed to pass a law changing the 2021 Commission's proposal. Instead, the Council passed Council Resolution 123, which, as we have made clear, falls short of a "law changing the [2021 Commission's] proposal . . . ." Art. III, § 305. Accordingly, the 2021 Commission's plan became effective by operation of law on November 30, 2021.

B.      *Confirming the Plain Language and Legislative History*

As a general principle of good governance, some form of redress should be available to Prince George's County citizens if the Council passes a plan establishing councilmanic districts contrary to the public will. *Cf. George v. Balt. Cty.*, 463 Md. 263, 268 (2019) (observing that "[t]axpayer standing doctrine encourages the highest good governance standards by empowering stakeholder oversight of local governments"). This redress may

23

take one of two forms: (1) petition to referendum—in which voters place a matter on the ballot for approval or rejection; or (2) executive veto—in which voters can lobby the County Executive to reject a matter passed by the Council.

To the first form of redress, while the Charter guarantees petition to referendum of "any law which becomes law pursuant to [the] Charter," the same provision also excepts certain laws from petition to referendum, namely "a law . . . establishing Councilmanic districts." Art. III, § 319(3). Therefore, petition to referendum is not available to Prince George's County citizens dissatisfied with a councilmanic districting plan enacted by the Council. The limitation on this form of redress is not uncommon; six other charter counties exempt redistricting plans from petition to referendum. *See* Cecil County Charter, Art. II, § 214(d); Dorchester County Charter, Art. II, § 213(d); Frederick County Charter, Art. II, § 214(d); Harford County Charter, Art. II, § 220(a)(3); Howard County Charter, Art. II, § 202(f)(1); Montgomery County Charter, Art. I, § 114(2).

This leaves executive veto as the lone method of redress. A function of the executive veto is that citizens may express their views by lobbying the County Executive to approve or veto Council measures. Perhaps most alarming is the County's assertion that a resolution changing the proposal of the redistricting commission, which we have already concluded is invalid, would not be subject to presentment to the County Executive.

Unlike resolutions, which are passed exclusively within the province of the Council, bills are presented to the County Executive. *See* Art. IV, § 411 (emphasis added) ("Upon the enactment of any *bill* by the Council, . . . it shall be presented to the County Executive within ten days for [the County Executive's] approval or disapproval."). To prevent the

24

Council from conducting all of its affairs unilaterally without approval from the County Executive, only "measures made expressly exempt from the executive veto by [the] Charter" avoid presentment. *Id.* Neither the Charter, nor the legislative history of the 2012 Amendment, give an indication that redistricting plans enacted by the Council would be exempt from executive veto.

Under the County's interpretation, the Council would be free to pass an alternative redistricting plan—one changing the proposal submitted by the redistricting commission— unchecked by either petition to referendum *or* executive veto. To be sure, Prince George's County is free to amend the Charter and exempt councilmanic districting legislation from executive veto; however, as the Charter exists today, no provision operates to that effect.

History confirms as much. Excluding the current redistricting, Prince George's County has redrawn its councilmanic districts four times. Twice, the Council modified the plan submitted by the redistricting commission, passed a bill enacting a new redistricting plan, and presented the bill to the County Executive for approval or rejection. In 1981, County Executive Lawrence J. Hogan, Sr., presented with CB-184-1981 ("Council Bill 184"), declined to veto the bill or sign it into law. With this inaction, Council Bill 184 became law after ten days. *See* Art. IV, § 411. In 2011, County Executive Rushern L. Baker, III, presented with CB-64-2011 ("Council Bill 64"), signed into law Council Bill 64.

A review of other county charters further confirms that a council-passed redistricting plan is subject to presentment in Prince George's County. Two charter counties in Maryland include express provisions exempting council-passed redistricting

25

plans from executive veto. Importantly, however, where council-passed redistricting plans are exempted from executive veto, these provisions ensure that petition to referendum is an available form of redress. The Anne Arundel County Council is "empowered by ordinance . . . to revise, amend or reconstitute councilmanic districts." Anne Arundel County Charter Art. II, § 207. Any ordinance of this nature "shall not be subject to executive veto" but "shall be subject to the referendum provisions" of the Anne Arundel County Charter. *Id.* Similarly, in Baltimore County, "[t]he final redistricting plan adopted by the county council is not subject to the executive veto provided in Article III, Section 308(g), but is subject to the referendum provision of Article III, Section 309." Baltimore County Charter, Art. II, § 207.

The Charter and seven other county charters are silent on exempting redistricting plans from executive veto.[19] *See* Cecil County Charter, Art. II, § 214; Dorchester County Charter, Art. II, § 213; Frederick County Charter, Art. II, § 214; Harford County Charter, Art. II, § 205; Howard County Charter, Art. II, § 202(f); Montgomery County Charter, Art. I, § 104; Wicomico County Charter, Art. II, § 201.[20]

In sum, every other charter county in Maryland provides its citizens one or two methods of redress to challenge councilmanic districting plans. To adopt the County's

---

[19] The Talbot County Charter contains no provision on redistricting because council members in that county are elected at-large. *See* Talbot County Charter, Art. II, § 204.

[20] Wicomico County is unique in that its charter does not exempt redistricting plans from either executive veto or petition to referendum. Wicomico County Charter, Art. II, § 312 (reserving to the people of Wicomico County the right to petition to referendum "any public local law or any part of any public local law hereinafter passed").

position would deprive Prince George's County citizens of *any* method of redress.  We decline to do so.

## C.      *The County's Alternative Support for Use of a Resolution*

Aside from the interpretation of § 305, the County provides corollary arguments as to why it believes the Council is permitted to enact an alternative redistricting plan by resolution.  Neither basis impacts our interpretation of § 305, which ultimately controls the outcome of this case, but we briefly address each in turn.

### 1.     *Express Powers Act*

The Home Rule Amendment "mandated that the General Assembly enumerate and delegate certain powers, which may be exercised by counties electing a charter form of government." *Angel Enters. Ltd. P'ship v. Talbot Cty.*, 474 Md. 237, 261 (2021) ("*Angel*") (citing *Ritchmount P'ship v. Bd. of Supervisors of Elections for Anne Arundel Cty.*, 283 Md. 48, 57 (1978)).  To satisfy this constitutional obligation, the General Assembly enacted the Express Powers Act, Maryland Code ("Md. Code") (2013), Local Government Article ("LG") § 10-101, *et seq.*[21]  *See id.* (collecting cases).

LG 10-102(a) authorizes charter counties to exercise express powers by legislative enactment.  The Express Powers Act sets out the express powers of charter counties in LG § 10-201, *et seq.* and LG § 10-301, *et seq.*  In addition to those powers expressly

---

[21] As a part of code revision—"a periodic process by which statutory law is re-organized and restated with the goal of making it more accessible and understandable to those who must abide by it," the General Assembly created the Local Government Article in 2013. *Johnson*, 467 Md. at 381 n.8 (citation omitted); 2013 Md. Laws, ch. 119.  Before this recodification, Md. Code (1957, 2011 Repl. Vol.), Article 25A, § 5 "enumerated express powers that were granted to and conferred upon charter counties." *Angel*, 474 Md. at 261.

enumerated, "[a] county council may pass any ordinance, resolution, or bylaw not inconsistent with State law that . . . may aid in executing and enforcing any power" specified in the Express Powers Act, or "may aid in maintaining the peace, good government, health, and welfare of the county." LG § 10-206(a)(1)–(2). Chief among the express powers, for purposes of the instant case, is that contained in LG § 10-306: "[a] county may create and revise election districts and precincts."

From these provisions, the County suggests that the Council may pass a resolution to implement the County's express power to create and revise councilmanic districts. This rationale is problematic, though, for the simple reason that it fails to account for the redistricting provisions enshrined in the Charter and ratified by the Prince George's County voters. The inclusion of § 305 in the Charter is the County's legislative enactment that aids in executing the express power of creating and revising election districts.

It strains credulity to read the Express Powers Act in a vacuum to conclude that the Council may skirt duly enacted and ratified provisions of its Charter and act by resolution where another form of legislative action is plainly required. For the reasons discussed more fully above, § 305 requires the Council to pass a "law," if it wishes to change the plan proposed by the redistricting commission. The Express Powers Act cannot, and does not, save the County's argument to the contrary.

2.    *State Legislative Districting*

Finally, the County contends that the 2002 and 2012 amendments to § 305 aligned the Council redistricting procedures with the statewide legislative districting process enshrined in Article III, § 5 of the Constitution of Maryland. The County maintains that

28

those amendments authorize the Council to utilize a resolution to implement districting plans. In the opening words of its petition for writ of *certiorari*, the County likened the Council redistricting process to the method by which the State enacts new legislative districts once every ten years.[22] The County seemingly recast this comparison in its briefing to this Court but recommitted at oral argument that the State procedures should inform the interpretation of the Charter provisions.[23]

---

[22] The County posited:

> The General Assembly is *required* by [the] Constitution [of Maryland] to adopt its decennial legislative districting by resolution—and it did so. The County Council of Prince George's County is also *required* by its Constitution[, the Charter,] to adopt its Redistricting Plan by *resolution*— and it did so.

> * * *

> If the circuit court['s interpretation] is *right*—this Court should *toss* the General Assembly's Plan . . . because it *too* was adopted by resolution. Because the General Assembly and Council were *administering* or *implementing* "existing redistricting law" *already in force and effect*, neither legislative body was *required* to adopt decennial Plans by *bill* because they were *not* making *new* law or prescribing a *permanent rule* or *conduct* to continue in force *until* repealed.

(Emphasis in original and footnotes omitted).

[23] At oral argument, counsel for the County asserted:

> The question for the Court is whether or not . . . a resolution having the force and effect of law [is] a valid measure to pass redistricting . . . . [T]he State does it. Did [the Council] do it as artfully as the State did? No. But it doesn't mean it cannot be done by resolution.

29

a.       Article III, § 5 of the Constitution of Maryland

Every ten years, following the decennial census of the United States, the Governor of Maryland is constitutionally mandated to prepare a plan establishing new legislative districts for the election of members of the Senate of Maryland and the House of Delegates. Md. Const. art. III, § 5.  The plan must conform with Article III, §§ 2, 3, and 4 of the Constitution of Maryland. *Id.*  The Governor is required to present the plan to the President of the Senate and the Speaker of the House of Delegates—"who shall introduce the Governor's plan *as a joint resolution* to the General Assembly"—no later than the first day of the General Assembly's regular session in the second year following each census. *Id.* (Emphasis added).  The Governor may call a special session of the General Assembly and present the plan prior to the regular session. *Id.*

Notwithstanding the Governor's plan, the General Assembly "may by joint resolution adopt a plan" establishing legislative districts for the election of members of the Senate of Maryland and the House of Delegates.  Md. Const. art. III, § 5.  The General Assembly's plan, if any, must also conform with Article III, §§ 2, 3, and 4 of the Constitution of Maryland. *Id.*

If the General Assembly adopts a plan by the forty-fifth day after the opening of the regular session in the second year following the census, that plan "shall become law."  Md. Const. art. III, § 5.  If the General Assembly does not adopt a plan by the forty-fifth day, the Governor's plan, as presented to the General Assembly, "shall become law." *Id.*

b.     <u>A Joint Resolution in Annapolis Does Not Permit a Resolution in Upper Marlboro</u>

We straightforwardly dispense of this argument. We disagree with the County that, because a joint resolution is required to present the Governor's legislative districting plan or permitted to introduce, if any, the General Assembly's legislative districting plan, the Council may use a resolution to enact an alternative redistricting plan under the Charter.

It is axiomatic that statewide legislative districting is governed by the Constitution of Maryland and councilmanic redistricting is governed by the Charter. Importantly, these two procedures are structured differently. At the state level, the Executive's role is at the forefront of the process in presenting a plan to the General Assembly. In Prince George's County, the Executive's role is reserved to the end *if* the Council acts to change the redistricting commission's proposal. If the Council adopts the plan of the redistricting commission, the County Executive has no opportunity to veto it. Only once the redistricting commission creates a proposal—and the Council passes a law changing it— does the County Executive have an opportunity to sign or veto the presented plan. In all, the State and Prince George's County have separate and distinct redistricting procedures.

Moreover, a "Joint Resolution" in the General Assembly has specific uses that differ from a "resolution" as defined by the Charter. As explained in the most current Legislative Drafting Manual, a Joint Resolution (1) must be used for "[a] matter that is of general import, is substantial, or relates to public policy"; (2) "can express the opinion . . . of both bodies of the General Assembly"; and (3) "may be used to request the establishment of a temporary or ad hoc task force, committee, or commission . . . ." *Legislative Drafting Manual 2022*, Dep't Leg. Servs. Off. of Pol'y Analysis, at 119–20 (Sept. 2021) ("2022

31

Legislative            Drafting            Manual"),            available            at

https://dls.maryland.gov/pubs/prod/LegisBillDrafting/LegislativeDraftingManual.pdf,

archived at https://perma.cc/5DXH-95NB.[24]   In limited circumstances, the General

Assembly must act by Joint Resolution.  Notably, as we have observed, Article III, § 5 of

the Constitution of Maryland requires the General Assembly to address "reapportionment

of legislative districts" by joint resolution.  *Id.* at 120.  The utility of a "resolution," as

defined in the Charter, greatly differs from that of the state legislature's Joint Resolution.

Thus, the County's attempt to infer that the use of the latter permits the former must fail.

Our interpretation of § 305, as set out in this Opinion, requires the Council, if it

chooses to adopt the plan submitted by the redistricting commission, to do so by resolution

upon notice and public hearing.  It does not authorize the Council to enact an alternative

redistricting plan by resolution.  The state constitutional provisions governing the

legislative districting of the State do nothing to change this reading of the Charter.

In sum, neither the Express Powers Act nor the state constitutional provisions

concerning state legislative districting compels us to disturb our interpretation of the plain

language of § 305, read in context of the surrounding charter provisions, and bolstered by

the legislative history of the provision.

---

[24] The Maryland Department of Legislative Services annually updates and publishes the Legislative Drafting Manual "to assist those involved in the drafting of bills and amendments for the Maryland General Assembly."  2022 Legislative Drafting Manual, at iii.  The Legislative Drafting Manual is intended "to ensure accuracy, clarity, and uniformity in the drafting of legislation in Maryland by promoting compliance with constitutional principles, rules of law and statutory interpretation, and accepted practices regarding style, form, and process."  *Id.*

## CONCLUSION

Article III, § 305 of the Charter for Prince George's County establishes the procedures for decennial redistricting of councilmanic districts. Specifically, § 305 provides, in pertinent part, that "[i]f the Council passes no other law changing the proposal [of the redistricting commission], then the plan, as submitted, shall become law . . . . Such law shall be adopted by resolution of the County Council upon notice and public hearing."

We hold that § 305 requires the Council, if it chooses to adopt the plan of the redistricting commission, to do so by resolution upon notice and public hearing. The language of § 305, however, does not authorize the Council to enact an alternative redistricting plan by resolution. For the Council to enact a councilmanic districting plan different from the plan proposed by the redistricting commission, the Council must use a "bill" to pass a "law," subject to presentment to the County Executive and executive veto.

Where the 2021 Commission transmitted its redistricting plan and report to the Council on September 1, 2021 and the Council failed to pass a law changing the 2021 Commission's proposal, the 2021 Commission's plan became effective by operation of law on November 30, 2021.

For the foregoing reasons, by per curiam order issued March 7, 2022, this Court affirmed the circuit court's January 31 Order in all respects and further ordered that the redistricting plan prepared by the 2021 Commission be used for all purposes in acting upon or implementing the County's redistricting plan.