*Jacob Bennett v. Harford County, Maryland*, No. 38, September Term, 2022.

**STATUTORY INTERPRETATION – ELIGIBILITY TO BE A HARFORD COUNTY COUNCIL MEMBER**

Section 207 of the Harford County Charter, which prevents a Council member from holding employment in the government of the State, Harford County, or any municipality within Harford County, does not preclude a teacher employed by the Harford County Board of Education from simultaneously serving as a member of the Harford County Council. Finding Charter § 207 ambiguous concerning whether it applies to employees of the Board, the Court applied a canon of construction favoring candidate eligibility to resolve the ambiguity.

**PUBLIC EMPLOYMENT – INCOMPATIBLE POSITIONS**

The doctrine of incompatible positions does not preclude a teacher employed by the Harford County Board of Education from simultaneously serving as a member of the Harford County Council.

Circuit Court for Harford County

Case No. C-12-CV-22-000857

Argued: April 4, 2023

IN THE SUPREME COURT

OF MARYLAND*

No. 38

September Term, 2022

_____

JACOB BENNETT

v.

HARFORD COUNTY, MARYLAND

_____

Fader, C.J.,
Watts,
Hotten,
Booth,
Biran,
Gould,
Eaves,

JJ.

_____

Opinion by Fader, C.J.
Gould, J., dissents.

_____

Filed: August 30, 2023

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

* At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals of Maryland to the Supreme Court of Maryland. The name change took effect on December 14, 2022.

Jacob Bennett, the appellant, and Harford County, Maryland (the "County"), the appellee, dispute whether Mr. Bennett is barred from serving as a member of the Harford County Council (the "Council") because of his employment as a schoolteacher by the Harford County Board of Education (the "Board"). In the November 2022 general election, Mr. Bennett was elected to the Council. Soon after, a dispute arose between Mr. Bennett and the County concerning whether he is precluded from serving simultaneously as a member of the Council and as an employee of the Board by either: (1) Section 207 of the Harford County Charter (the "Charter"), which prohibits a Council member from holding, among other things, "employment in the government of the State of Maryland[ or] Harford County"; or (2) the common law doctrine of incompatible positions. We hold that neither Charter § 207 nor the doctrine of incompatible positions bars Mr. Bennett from simultaneously serving as a member of the Council and an employee of the Board.

First, Charter § 207 does not preclude Mr. Bennett from serving on the Council because his employer, the Board, does not have the character of either a State or County government entity in the context presented. County boards of education can have the character of State, county, hybrid, or independent entities. Which character applies to a particular situation depends on context and applicable statutory and regulatory provisions. As applied in the context of Charter § 207, a county board of education does not have a particular character as State, county, hybrid, or independent entity. We therefore turn to our canons of statutory interpretation to discern the legislative intent underlying the provision. Because the language of § 207 is ambiguous and legislative history clarifies only part of that ambiguity, we employ a canon of statutory interpretation favoring

candidate eligibility. We ultimately conclude that, for purposes of the applicability of § 207, the Board is an independent entity, neither State nor County, and that § 207 therefore does not preclude Mr. Bennett from simultaneously serving as a member of the Council and an employee of the Board.

Second, the doctrine of incompatible positions does not preclude Mr. Bennett's simultaneous service on the Council and as an employee of the Board because there is no present or prospective conflict of interest between the positions; neither position has a level of supervisory power over the other or the ability to hire, fire, or set the salary of the other; and none of the functions of the offices are "inherently inconsistent and repugnant." *Hetrich v. County Comm'rs of Anne Arundel County*, 222 Md. 304, 308 (1960) (quoting *Lilly v. Jones*, 158 Md. 260, 266 (1930)). The Council's limited roles with respect to the budget and membership of the Board are too attenuated from Mr. Bennett's position as a teacher to implicate the doctrine.

For those reasons, in a per curiam order issued following oral argument, we held that Mr. Bennett was not barred from serving on the Council while remaining a schoolteacher employed by the Board, reversed the contrary order and declaratory judgment of the Circuit Court for Harford County, and remanded the case with instructions to that court to enter a declaratory judgment in accord with our order. *Bennett v. Harford County*, 483 Md. 414 (2023) (per curiam). We now explain the basis for that order.

2

# BACKGROUND

## A. *The Harford County Charter and the Council*

Harford County is governed by the terms of a charter adopted by the eligible voters of the County in November 1972. *See* Maryland Manual 1973-1974, at 589 (Morris L. Radoff & Frank F. White, Jr., eds., 1974). The legislative branch of the County government is the seven-member Council. Harford County Charter § 201. Six members of the Council must, at the time of their elections, reside in one of the County's six Council districts. *Id.* § 204. The seventh, who serves as Council President, is elected at large. *Id.* Members are elected for four-year terms on the same schedule as the election of state officers. *Id.* §§ 204, 206.

To be qualified to serve as a Council member, a candidate must "have been a resident and a qualified voter of the County for at least two years immediately preceding election or appointment," and (other than the Council President) "a resident of the Council district from which elected or appointed." *Id.* § 207.

While serving on the Council, a "member shall not hold any other office of profit or employment in the government of the State of Maryland, Harford County, or any municipality within Harford County, except a position held by virtue of being a Council member." *Id.* Members are further ineligible during their term "for appointment to any County office or position carrying compensation" other than Council member or the County Executive. *Id.*

This dispute centers on the prohibition in Charter § 207 against a member holding "employment in the government of the State of Maryland[ or] Harford County" while serving on the Council.[1]

### B.  Factual Background

Before the circuit court, the parties stipulated to the following facts, among others.

Mr. Bennett is a teacher in the Harford County Public Schools, employed by the Board.  For the 2022-2023 school year, Mr. Bennett was under contract with the Board to teach wherever the Superintendent of the Harford County Public Schools assigned him.

In the November 2022 General Election, the voters of Harford County Council District F elected Mr. Bennett to serve as the Council member representing that district. Mr. Bennett intends to work as a teacher in Harford County Public Schools while simultaneously serving as a Council member.

Mr. Bennett is paid by the Board.  As a teacher, Mr. Bennett participates in the State retirement system, with funding that comes from the County.

The Board receives substantial funding from the State, some of which comes from federal programs, and the County.  Annually, the Board submits a proposed budget to the County Executive and the Council.  Since 1972, the County Executive and the Council have fully funded the Board's proposed budget only four times, three of which were the last three fiscal years.  Each year, the Council meets with Board representatives, considers the Board's proposed budget and any proposed cuts to it, and usually approves in part and

---

[1] As no party contends that the Board could be considered a government entity within a "municipality in Harford County," we do not consider that part of Charter § 207.

4

denies in part the proposal. The Council also considers and acts on Board requests to transfer funds in the Board's budget between major categories. In making its funding decisions, the Council allocates County funds among the various agencies and units of government that receive funds from it, including several non-County entities.[2] The Board is the largest recipient of County operating budget funds.

Annually, the Council approves the allocation of County revenues to the Board, which the Board uses to pay for textbooks and classroom supplies; information and communication technology; a fleet of vehicles; and the salaries of its personnel, including teachers. The Council also approves the allocation of County revenues to the Board to pay for debt service on bonds issued to fund Board facilities, as well as to fund construction of and improvements to Board facilities.

Mr. Bennett's compensation as a member of the Council would be $49,000 per year.

### C. Procedural Background

About one month after Mr. Bennett's election, the County filed this action. In its complaint, the County sought a declaratory judgment that Mr. Bennett was not qualified to serve on the Council while employed by the Board, as well as an injunction barring him from serving on the Council. Before the circuit court, the County argued that the Board was either a State or a County agency and that, in either case, Mr. Bennett's employment with the Board rendered him unqualified to serve on the Council pursuant to Charter § 207

---

[2] Among the non-County agencies that receive funding from the County, as approved by the Council, are the Sheriff and Sheriff's office, the Harford County Health Department, circuit court personnel, State's Attorney's Office personnel, and the Harford Soil Conservation District.

and the doctrine of incompatible positions. Mr. Bennett contended that the Board was neither a State nor a County agency and, therefore, he was not precluded from serving on the Council. Mr. Bennett counterclaimed for injunctive, declaratory, and mandamus relief to force the County to permit him to serve on the Council.

In February 2023, after a hearing, the circuit court ruled for the County. The court concluded that because the controversy arose from the Council's required input on the Board's annual budget, and budgetary issues are local in nature, the Board should be treated as a County entity for purposes of Charter § 207. The court noted that even if the Board were instead treated as a State agency, "the result [would] remain[] the same." The court accordingly entered a declaratory judgment and order in which it: (1) declared that Charter § 207 "applies to public school teachers employed by the Harford County Board of Education"; (2) declared that Mr. Bennett, due to his employment with the Harford County Board of Education, "is not qualified to be a member of the Harford County Council"; (3) ordered Mr. Bennett to "cure his lack of qualification . . . by terminating his employment with the Harford County Board of Education"; and (4) enjoined Mr. Bennett from acting as a member of the Council "unless and until he cures his lack of qualification[.]"

Mr. Bennett filed a notice of appeal with the Appellate Court of Maryland,[3] and petitioned for a writ of certiorari to this Court before action was taken by the Appellate

_____

[3] At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Special Appeals of Maryland to the Appellate Court of Maryland. The name change took effect on December 14, 2022.

6

Court. This Court granted Mr. Bennett's petition and the parties' joint petition for expedited proceedings on March 6, 2023. *Bennett v. Harford County*, 483 Md. 264 (2023).

On April 5, 2023, following oral argument, we issued a per curiam order reversing the circuit court and declaring that neither Charter § 207 nor the doctrine of incompatible positions precludes Mr. Bennett from serving on the Council while employed as a teacher by the Board. *Bennett*, 483 Md. at 416. We therefore remanded the case to the circuit court with instructions to enter: (1) a declaratory judgment that Mr. Bennett is qualified to serve as a member of the Harford County Council while being employed as a teacher by the Harford County Board of Education; and (2) any injunctive relief that may be necessary and appropriate to implement and enforce that declaratory relief. *Id.* We now explain the basis for our order.

## DISCUSSION

The interpretation of a provision of a county charter is a legal question, which we review without deference. *Prince George's County v. Thurston*, 479 Md. 575, 585 (2022). The application of the doctrine of incompatible positions to undisputed facts is also a question of law, which we again review without deference. *See Uthus v. Valley Mill Camp, Inc.*, 472 Md. 378, 385 (2021).

## I. CHARTER § 207

Charter § 207 prohibits an individual from serving as a Council member if, among other things, the individual is employed by the State of Maryland or the County. Mr. Bennett is employed by the Board. The dispositive question is thus whether the Board, for purposes of the application of § 207, is a State entity, a County entity, or neither. The

7

answer is not straightforward. Statutes treat county boards of education as State entities for some purposes, County entities for others, and hybrid or independent entities for yet others. Our decisional law reflects that the character of county boards of education changes depending on the context in which an issue arises. We therefore begin with an exploration of the role of county boards of education as they relate to the State and the County.

### A.    The Statutory Scheme

Article VIII, § 1 of the Constitution of Maryland requires the General Assembly to "establish throughout the State a thorough and efficient System of Free Public Schools," and to "provide by taxation, or otherwise, for their maintenance." The framework the General Assembly has created for that system of free public schools is contained in the Education Article (2022 Repl.).

Title 2 of the Education Article establishes the State Department of Education as a principal department of the State government, with the State Board of Education (the "State Board") serving as head of the department. Educ. §§ 2-101, 2-102. The State Board, which consists of 13 regular members and one student member, *id.* § 2-202(a), is charged broadly with "[d]etermin[ing] the elementary and secondary educational policies of this State," and "[c]aus[ing] to be carried out those provisions of this article that are within its jurisdiction," *id.* § 2-205(b)(1) & (2).

The State Board appoints a state superintendent, who serves as the chief executive, secretary, and treasurer of the State Board and is charged with "[c]arry[ing] out the educational policies of the State Board." *Id.* §§ 2-204(c)(1); 2-302(a); 2-303(c)(1). Through the state superintendent, the State Board "exercise[s] general control and

supervision over the public schools and educational interests of this State" and "establish[es] basic policy and guidelines for the program of instruction for the public schools." *Id.* § 2-205(g)(2) & (h)(1). The State Board is authorized to "adopt bylaws, rules, and regulations for the administration of the public schools," *id.* § 2-205(c); prepare and send to the Governor, after certification by the state superintendent, "the annual State public school budget," which includes State aid to counties, *id.* § 2-205(j); "explain the true intent and meaning of the provisions of" the Education Article that are within its jurisdiction and the bylaws, rules, and regulations it adopts, *id.* § 2-205(e)(1); and "decide all controversies and disputes under these provisions," *id.* § 2-205(e)(2). This Court has described the State Board's broad authority "as a visitatorial power of such comprehensive character as to invest [it] with the last word on any matter concerning educational policy or the administration of the system of public education." *Donlon v. Montgomery County Pub. Schs.*, 460 Md. 62, 81 (2018) (quoting *Bd. of Educ. of Prince George's County v. Waeldner*, 298 Md. 354, 360 (1984)).

Title 3 of the Education Article establishes "a county board of education," co-extensive with the geographical boundaries of each county in the State, "for each county school system." Educ. §§ 3-102, 3-103. State law governs the size, composition, and manner of selection of the members of each county board of education. *See generally id.* §§ 3-105–3-1405. In Harford County, the Board consists of six elected members: one from each Council district; three members appointed by the County Executive, subject to the advice and consent of the Council; the county superintendent of schools (ex officio); and one student member. *Id.* § 3-6A-01(b), (c) & (d). In the event of a vacancy of an

9

elected member of the Board, the Council is to appoint a qualified individual to serve for the remainder of the term. *Id.* § 3-6A-01(f)(1).

County boards of education are responsible for "educational matters that affect the counties." *Id.* § 4-101(a). Each county board of education is responsible for selecting a county superintendent, who is to serve as "the executive officer, secretary, and treasurer of the county board." *Id.* § 4-102; *see also id.* §§ 4-204, 4-205 (setting forth the powers and duties of county superintendents). Upon the written recommendation of the county superintendent, each county board is responsible for appointing and setting the salaries of "all principals, teachers, and other certificated and noncertificated personnel." *Id.* § 4-103.

Under State law, county boards are required, among other things, to carry out applicable provisions of the Education Article "and the bylaws, rules, regulations, and policies of the State Board"; maintain throughout their jurisdiction "a reasonably uniform system of public schools that is designed to provide quality education and equal educational opportunity for all children"; "determine . . . the educational policies of the county school system"; and promulgate "bylaws, rules, and regulations not inconsistent with State law, for the conduct and management of the county public schools." *Id.* § 4-108. To carry out those duties, county boards may establish public schools that, if approved by the state superintendent, "become[] a part of the State program of public education." *Id.* § 4-109.

Each county board of education must prepare and submit an annual budget "[s]ubject to the rules and regulations of the State Board and with the advice of the county superintendent." *Id.* § 5-101(a)(1). Although budgets are submitted to county governments, the contents and process for the submission, review, and approval of annual

10

budgets is prescribed by State law, which sets out in detail the categories that must be included in the budget for receipts and expenses. *Id.* § 5-101(b). Notably for our purposes, all "[i]nstructional salaries," including the salaries of all teachers, aides, psychological personnel, guidance counselors, and library personnel, constitute a single subcategory of a county board's budget. *Id.* § 5-101(b)(2)(iii).

In counties with a county executive and council, such as the County, budgets are due at least 45 days before the date for levying local taxes. *Id.* § 5-102(b). The county executive is first charged with identifying in writing categories of the budget to deny or reduce "and the reason for the denial or reduction." *Id.* § 5-102(c)(2). The budget then goes to the county council, which may "restore any denial or reduction made by the county executive." *Id.* § 5-102(c)(3). The budget must include at least the minimum amount of funding required by a formula set forth in § 5-235[4] of the Education Article. *Id.* § 5-103(a). If a county council does not ultimately approve the full amount requested by a county board, the county board must submit to the council, "within 30 days after the adoption of the budget, a report indicating how the alterations to the budget will be implemented, accompanied by reasonable supporting detail and analysis." *Id.* § 5-103(c)(2). The county council is then obligated to levy property taxes that, together with other available revenue, "will produce the amounts necessary to meet the appropriations made in the approved annual budget of the county board." *Id.* § 5-104(a). During a budget year, a county board may transfer funds within major budget categories on its own, but must obtain the county

---

[4] Section 5-103(a) of the Education Article references § 5-202(d)(1)(i), but § 5-202 was renumbered to § 5-235 in 2021. 2021 Md. Laws ch. 36.

11

council's approval to transfer funds between major budget categories. *Id.* § 5-105(b)(1) & (2).

County boards are responsible for employing individuals necessary to the operation of the public schools in the county, but they may not hire anyone as a county superintendent, supervisor, principal, or teacher unless the individual is eligible to be issued a certificate by the state superintendent. *Id.* §§ 6-101, 6-201(a)(1). The county superintendent is responsible for nominating, for the county board's approval, all professional assistants in the county superintendent's office and all principals, teachers, and other certificated personnel. *Id.* § 6-201(b)(1). The county superintendent is also responsible for the assignment, transfer, and recommendation for promotion of those personnel. *Id.* § 6-201(b)(2). On recommendation of the county superintendent, a county board may suspend or dismiss a teacher on specified grounds. *Id.* § 6-202(a). An appeal from such a decision may be made to the State Board. *Id.* § 6-202(a)(4).

As shown by the discussion above, county boards of education are: (1) integral parts of the State system of public education, which is established and thoroughly regulated by State law and ultimately presided over by the State Board; (2) organized, selected, and funded in significant part on a county level, although through a process grounded in State law; and (3) in many respects, distinct in their operations from both State and county entities.

The unique status of county boards is reflected in other statutes as well. For example, tort claims against State entities, including the State Board, and related immunity for State personnel, are governed by the Maryland Tort Claims Act, Md. Code Ann., State

12

Gov't §§ 12-101–12-110 (2021 Repl.; 2022 Supp.) & Cts. & Jud. Proc. § 5-522 (2020 Repl.); and tort claims against local government entities, including all counties and Baltimore City, and related protections for their employees, are governed by the Local Government Tort Claims Act, Cts. &. Jud. Proc. §§ 5-301–5-304. But tort claims against county school boards, including the Board, and protections for their members and employees, are governed by a separate tort claim and immunity regime applicable only to county boards of education. *See id.* § 5-518; *see also Neal v. Balt. City Bd. of Sch. Comm'rs*, 467 Md. 399, 422-24 (2020) (contrasting approaches taken under the Maryland Tort Claims Act and Local Government Tort Claims Act with Courts and Judicial Proceedings § 5-518). For purposes of tort claims handling, indemnification, and protection of personnel, county school boards are thus treated both separately and differently from both State entities and local government entities.

Maryland's Public Ethics Law also treats State entities, county entities, and county school boards separately. The Maryland Public Ethics Law contains provisions addressing conflicts of interest, financial disclosures, and lobbying that apply generally to State officials and employees. *See* Md. Code Ann., Gen'l Provs. §§ 5-101–5-716 (2019 Repl.; 2022 Supp.). Separately, "each county and each municipal corporation" is required to enact its own regulations governing the public ethics of local officials that, although similar to those applicable to State officials and employees, may be modified to be more relevant "in that jurisdiction." *Id.* §§ 5-807–5-810. And separately still, county school boards are required to adopt regulations governing the ethics of their own members and, if they choose, their officials and employees, that, although similar to the State provisions, may

13

be modified to be more relevant in "that school system." *Id.* §§ 5-815–5-818. Other statutes that distinguish between the State and the various governmental entities within it also further distinguish between counties and county boards of education, among other subdivisions. *See, e.g.*, *id.* § 4-101(j) (defining a "political subdivision" of the State, for purposes of the Maryland Public Information Act, to include a county, a municipal corporation, an unincorporated town, a school district, or a special district); State Gov't § 10-1301(f)(2) (defining "unit," as applicable to non-State entities, as including "a county, municipality, bi-county, regional, or multicounty agency, county board of education, public corporation or authority, or any other political subdivision of the State").[5]

## B. Treatment of County School Boards in Caselaw

Reflecting the complexity of the character of county school boards laid out in the Maryland Code, this Court has not adopted a uniform determination of the character of such boards for all purposes. Instead, we have recognized that their character can vary based on context. We recently traced the evolution of our caselaw in this area in determining whether a county school board is part of the executive branch of the State

---

[5] Provisions of the Harford County Code similarly treat the Board as an entity separate from the County and the State. *See, e.g.*, Harford County Code § 235-7(A)(1)(d) ("The applicant shall also state how many channels, what facilities and what services shall be provided free of charge to the County, the school systems and the public[.]"); *id.* § 235-10(F) ("On the County and educational channels, the company shall carry or cablecast such programming as designated by the County or its designated representative and the school system or its designated representative, respectively."); *id.* § 68-8 ("The government of the county, the County Board of Education and the Board of Trustees of the Harford Community College are hereby exempted from the provisions of this chapter.").

14

government for purposes of the State's Whistleblower Protection Law in *Donlon v. Montgomery County Public Schools*, 460 Md. 62 (2018).

In *Donlon*, we rejected the petitioner's contention that county school boards are State agencies for all purposes. *Id.* at 79. We acknowledged that several of our prior opinions had "referred to county boards of education as State entities in a variety of contexts," but concluded that "none [we]re consequential to the present case," both because the conclusory statements at issue were made in dicta and because they were not explained. *Id.* We also observed that courts had uniformly determined that county school boards are State agencies for purposes of sovereign immunity.[6] *Id.* at 80-81. However, we also noted that it was possible for an entity to "qualify as a State agency for some purposes, while being classified as a local agency for other purposes." *Id.* at 83 (quoting *Wash. Suburban Sanitary Comm'n v. Phillips*, 413 Md. 606, 632 (2010)).[7] Looking to our more recent

_____

[6] *See, e.g.*, *Lee-Thomas v. Prince George's County Pub. Schs.*, 666 F.3d 244, 248-49 n.5 (4th Cir. 2012) (discussing state and federal decisions recognizing that Maryland's county school boards are "instrumentalities of the State" for Eleventh Amendment immunity purposes); *Jones v. Frederick County Bd. of Educ.*, 689 F. Supp. 535, 538 (D. Md. 1988) (holding, in the context of an employment discrimination claim, that a county school board member, superintendent, and school principal, when employed by a county school board, are state officials protected by Eleventh Amendment immunity); *Bd. of Educ. of Balt. County v. Zimmer-Rubert*, 409 Md. 200, 205-06 (2009) (stating, in connection with sovereign immunity, that this Court has "long considered county school boards to be State agencies"); *Norville v. Anne Arundel County Bd. of Educ.*, 160 Md. App. 12, 62 (2004) (concluding that a county school board was "an arm of the State" and so protected by sovereign immunity), *vacated on other grounds sub nom. Anne Arundel County Bd. of Educ. v. Norville*, 390 Md. 93 (2005).

[7] In *Phillips*, in the course of concluding that the Washington Suburban Sanitary Commission was a local entity for certain purposes, we determined that the Commission "is a 'hybrid' entity, which defies simple and definitive categorization as either a 'State' or

15

cases, including *Chesapeake Charter, Inc. v. Anne Arundel County Board of Education*, 358 Md. 129 (2000) and *Beka Industries, Inc. v. Worcester County Board of Education*, 419 Md. 194 (2011), we concluded in *Donlon* that county boards of education are agencies whose character can vary based on context.

We first summarized our decision in *Chesapeake Charter*, in which we "elaborated . . . on the hybrid nature of county school boards of education." *Donlon*, 460 Md. at 83. The issue in *Chesapeake Charter* was whether the Anne Arundel County Board of Education is subject to the State's General Procurement Law and, therefore, to the jurisdiction of the Maryland State Board of Contract Appeals. *Id.* (discussing *Chesapeake Charter*, 358 Md. at 134). In resolving that question, we explained that county school boards "are generally regarded as State agencies because they are part of the State public education system, are subject to extensive supervision and control by the State Board of Education, and exercise a State function[.]" *Donlon*, 460 Md. at 83-84 (quoting *Chesapeake Charter*, 358 Md. at 139-40). Nonetheless, we noted that "from a budgetary and structural perspective, [county school boards] are local in character." *Id.* Indeed, we observed that "in terms of their composition, jurisdiction, funding, and focus, [county school boards] clearly have a local flavor[.]" *Donlon*, 460 Md. at 84 (quoting *Chesapeake Charter*, 358 Md. at 135-36). We also found it notable that county school boards "retain unique autonomy aspects, irrespective of the [State Board]'s authority," that weighed

---

'local' agency or instrumentality for any and all purposes." 413 Md. at 630 (citation omitted).

16

against concluding that they were part of the State procurement system. *Donlon*, 460 Md. at 85-86.

Ultimately, in the context presented in *Chesapeake Charter*, we concluded that "the county board's school bus contracts were not subject to the General Procurement Law because the board did not fall within the purview of the statute." *Id.* at 86. We held that "from a budgetary and structural perspective," county boards "are local in character[,]" and they do not comprise "'*divisions of or units within*' the State government." *Id.* (quoting *Chesapeake Charter*, 358 Md. at 139).

We next turned to our decision in *Beka*, which the petitioner in *Donlon* argued had limited our holding in *Chesapeake Charter*. We disagreed. *Donlon*, 460 Md. at 87. The relevant issue in *Beka* "was whether a county board of education retained its right to sovereign immunity asserted in defense to a breach of contract action under [State Government] § 12-201." *Id.* We concluded that our decision in *Chesapeake Charter* "did not foreclose, in *Beka*, a different analysis and holding" for purposes of the application of a sovereign immunity waiver. *Id.* at 87-88. We therefore "reiterated that, for purposes of Eleventh Amendment/sovereign immunity analysis, local boards of education are entities of State government." *Id.* at 88. The different answers provided in *Chesapeake Charter* and *Beka* concerning whether the county school boards at issue were units of State government resulted from the different contexts in which the questions arose. *See id.*

In turning to the facts of *Donlon*, we observed that "sovereign immunity [wa]s extraneous to the purpose and legislative history of the [Whistleblower Protection Law]." *Id.* After noting "the local flavor of a county board of education's budgeting process,"

which was central to the outcome of *Chesapeake Charter*, we observed that "[t]he blend of State, local, and independent characteristics of a county board extends beyond local budgetary concerns," and that "[p]ersonnel matters are inherently local at their inception." *Id.* at 90. Dissecting the relevant provisions of the Education Article, we specifically noted the special authority of county school boards—"distinct from [the State Board]"—over personnel matters and discipline. *Id.* at 91. Because the Whistleblower Protection Law is a law concerning personnel matters and discipline that is limited in its application only to State employees, we concluded that it was "not expansive enough . . . to cover under its umbrella county boards and their school teachers[.]" *Id.* at 94. We therefore held "that a county board of education is not an entity of the State . . . for purposes of the [Whistleblower Protection Law]."[8] *Id.* at 96.

As clarified in *Donlon*, county school boards do not have the same character for all purposes. To the contrary, they have a "blend of State, local, and independent characteristics," *id.* at 90, that, depending on context, could result in a determination that they are of a State, local, or independent character for a particular purpose. Which character prevails depends on an investigation of the particular context and the

---

[8] In *Donlon*, we went on to observe that during the pendency of that litigation, the General Assembly had expanded whistleblower protection to employees of county school boards, but chose to do so by enacting a new whistleblower protection law applicable only to county school boards, rather than by expanding or clarifying the reach of the State Whistleblower Protection Law. 460 Md. at 97-102. That is yet another example of the General Assembly treating county boards of education separately from both State and county entities.

characteristics of county school boards that are relevant to that context. With that understanding, we turn to the present dispute.

### C. The Character of the Board for Purposes of Charter § 207

Charter § 207 establishes the qualifications to be a member of the Council. One of those requirements is that the individual may not "hold . . . employment in the government of the State of Maryland[ or] Harford County." We must therefore determine whether the Board is of State, county, or independent character in the context of employment with the Board serving as a qualification for public office in the County.

The circuit court concluded that the Board is a County agency for purposes of Charter § 207 because "the issues springing from the controversy here are born from the Board's budget and the Council's role in the Board's budget." Observing that this Court in *Chesapeake Charter* had concluded that county school board budgetary issues are local in nature, the circuit court determined that the Board was a County agency for purposes of Charter § 207.

If Charter § 207 were a budgetary provision, we would agree with the circuit court's reasoning. But it is not. Charter § 207 establishes qualifications to hold office as a member of the Council, none of which are either expressly or implicitly tied to budget considerations. They appear in the middle of Article II of the Harford County Charter, which is titled "Legislative Branch" and contains provisions relating to the personnel, powers, duties, and operations of the Council. Provisions of the Charter relating to the budget are found in Article V, titled "Budget and Finance." Our focus must therefore be

19

on the character of the Board for purposes of employment with it serving as a qualification (or, here, disqualification) for public office.

In relevant part, Charter § 207 bases an individual's qualification to become a member of the Council on the individual's status as an employee (or not) of certain governments, untethered from any role or function of those governments. Where applicable, the limitation thus applies equally to all employees of the State, the County, or any municipality within the County, regardless of the roles those employees perform or whether their positions are in any way related to any business before the Council. The limitation applies equally to an administrative assistant employed by the Maryland Department of Labor, a laborer employed by the State Highway Administration, an inspector with the Harford County Liquor Control Board, and the Director of Finance of the Town of Bel Air.

In *Chesapeake Charter*, *Beka*, and *Donlon*, our analyses turned on the character of the role or function of the county board as it pertained to the issue in dispute: procurement matters, sovereign immunity, and personnel matters, respectively. But where affiliation with the county board is itself the purported disqualification, there is no applicable role or function of the county board to be analyzed to determine whether it is State, county, or independent in character. If Charter § 207 applies to county boards of education, it does so irrespective of the character of their operation in any particular area.

Because there is no necessary character of a county school board for purposes of determining whether its employees are eligible to serve in the government of a different governmental entity, we are ultimately confronted with a question of statutory

interpretation: whether the framers of the Harford County Charter intended Charter § 207 to render employees of the Board ineligible to serve simultaneously on the Council. To resolve that question, we turn to our canons of statutory construction, which "apply with equal force to the interpretation of a charter provision." *Prince George's County v. Thurston*, 479 Md. 575, 586 (2022). As we set forth earlier this term:

> "Our goal is to ascertain and effectuate the intention of the legislature and we begin that exercise by reviewing the statutory language itself." [*Comptroller v.*] *Citicorp*[ *Int'l Commc'ns, Inc.*], 389 Md. 156, 165 [(2005)] (quotations omitted). We read the plain meaning of the language of the statute "as a whole, so that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory." *Wheeling v. Selene Fin. LP*, 473 Md. 356, 376 (2021) (quoting *Koste v. Town of Oxford*, 431 Md. 14, 25-26 (2013) (internal quotations omitted)). "Additionally, we neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute, and we do not construe a statute with forced or subtle interpretations that limit or extend its application." *Wheeling*, 473 Md. at 376-77 (quoting *Lockshin v. Semsker*, 412 Md. 257, 274 (2010)) (cleaned up). "If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to legislative intent ends ordinarily and we apply the statute as written, without resorting to other rules of construction." *Id.* at 377 (quoting *Lockshin*, 412 Md. at 275). That said, as the Court recently reiterated in *Wheeling*,

> [w]e, however, do not read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone. Rather, the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute. We presume that the Legislature intends its enactments to operate together as a consistent and harmonious body of law, and, thus, we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope.

> Where the words of a statute are ambiguous and subject to more than one reasonable interpretation, or where the words are clear and unambiguous when viewed in isolation, but become ambiguous when read as part of a larger statutory scheme, a court must resolve the ambiguity by searching for legislative intent in other indicia,

including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process. In resolving ambiguities, a court considers the structure of the statute, how it relates to other laws, its general purpose, and the relative rationality and legal effect of various competing constructions.

In every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense.

473 Md. at 377 (quoting *Lockshin*, 412 Md. at 275-76) (internal quotations omitted).

*Comptroller v. FC-GEN Operations Invs. LLC*, 482 Md. 343, 379-81 (2022).

We have recognized another canon of statutory interpretation applicable specifically to provisions relating to candidate qualification: When statutory language is ambiguous, there is "a presumption in favor of the eligibility of one who has been elected or appointed to a public office." *Mayor & Comm'rs of Westernport v. Green*, 144 Md. 85, 89 (1923); *see also Abrams v. Lamone*, 398 Md. 146, 179-80 (2007) (discussing the presumption in favor of eligibility).

Because county boards of education are not inherently of either State or county character, and Charter § 207 does not expressly mention the Board, the language of the provision sheds no light on whether the Board should be considered a State or County entity, or neither, for purposes of determining the qualifications of a member of the Council.

Context provided by other sections of the Charter suggests that the framers did not view the Board as part of the County government. Article IV of the Charter identifies the administrative organization of the County. Section 401 provides that "[e]xcept as otherwise provided in this Charter or in state law, *all* agencies of the County government

22

shall be subject to the direction, supervision, and control of the County Executive."
(Emphasis added). Section 402 then identifies 11 agencies as being within the executive
branch of the County government, along with "any other agencies established by law."[9]
The Board is not among the agencies listed. Indeed, the sole mention of the Board in the
Charter is in § 409, which concerns the Harford County Department of Parks and
Recreation. In setting out duties of the Director of that department, § 409(b) requires the
Director to "encourage the development of cooperative programs and joint use of facilities
with the Board of Education[.]" The only mention of the Board in the Charter is thus a
direction that a County department seek to cooperate with it.

The County directs us to Charter § 502, which contains definitions "of terms used
in" Article V, the Budget and Finance Article. The first definition is: "The term of
'County' or 'County government' shall include all agencies and their officers, agents, and
employees who receive or disburse County funds." As a recipient of County funds, the
Board falls squarely within that definition, which the County encourages us to apply as
well to Charter § 207. To do so, however, we would have to ignore both (1) the express
limitation on the scope of that definition to the provisions of Article V and (2) the much
different scope of County government agencies identified in Article IV. Contrary to the

---

[9] As we observed in *Donlon*, "§ 8-201 of the State Government . . . Article lists 19 [now 21] principal departments of the Executive branch of State government," and "county boards of education are not" among them. *Donlon*, 460 Md. at 82. As we also noted in *Donlon*, the State Department of Education is not listed in § 8-201 either, but it is separately identified as a "principal department of the State Government" in Education § 2-101. *Id.* at 82 n.8. The Board is thus not identified in the laws of the State or the County as a principal department or agency of either.

23

County's view, the decision of the framers of the Charter to expressly limit the applicability of that broad definition of "County" only to the Budget and Finance Article suggests that they understood the term to have a narrower—or at least a different—meaning when used elsewhere in the Charter.

Our consideration of "the purpose, aim, or policy" underlying Charter § 207, *FC-GEN*, 482 Md. at 380, sheds little additional light on our inquiry. Section 207 does not identify its purpose. It does not state why individuals employed by the State, the County, or a municipality in the County are precluded from serving on the Council, nor is that readily apparent from the set of entities included. If the intent underlying the restriction is to avoid a conflict concerning the Council's budgeting responsibilities, as the circuit court seemed to conclude, it would appear to be both overly broad (in its application to all State employees) and overly narrow (in its omission of non-governmental entities that receive or benefit from County funding). An intent to avoid overlap with governmental entities over which the Council exercises some measure of control also would not explain the inclusion of State government employees. And an intent to avoid entanglement with *all* other governmental entities, as suggested by the County, seems inconsistent with the omission of the federal government—which, notably, is included in the analogous provision applicable to the County Executive, *see* Charter § 305—and the governments of neighboring jurisdictions. Nor is it readily apparent how precluding service by public schoolteachers would further that goal. We are therefore unable to discern a clear legislative purpose underlying Charter § 207 to aid in our interpretation.

Although context suggests that the framers of the Charter did not view the Board as part of the County government, we do not find that context strong enough to be dispositive. As a result, after considering the plain language, context, and purpose of Charter § 207, we conclude that the provision is ambiguous with respect to whether employment with the Board disqualifies an individual from simultaneous service on the Council. We therefore turn to other indicia of legislative intent.

The scant legislative history that might reflect on the question before us consists mostly of explanations provided by one member of the Charter Board during a January 27, 1971 public hearing. During that hearing, in response to comments from the County superintendent of schools, Charter Board member Robert J. Carson explained his view that the Board was part of a state education system and, therefore, that the "[s]uperintendent and all the employees underneath of that [position], I don't think, will be affected in any way by the charter," with the possible exception of school construction bonds. He also explained that the County lacked the authority to alter the manner of selecting members of the Board. And in responding to a different inquiry about why education was not included in the Charter, Mr. Carson stated that was because "the State alone controls the educational system in this State and forbids the Counties passing local laws in respect to schools." He observed, however, that the County pays for a portion of the education system, as required by State law, and that the County Executive and the Council would scrutinize that part of the budget. To the extent these comments can be understood to reflect the understanding

of the Charter Board as a whole,[10] they are evidence that the framers did not consider the Board to be an agency of the County government. Although the same comments indicate that the framers understood the Board to be part of the Statewide system of public education, they do not necessarily suggest that the Charter Board members viewed it as an entity of the State government. That subject simply did not come up.

Legislative history also strengthens our conclusion that the definition of "County" included in Charter § 502 was not intended to apply outside of Article V of the Charter. In the first draft of the Charter, the term "County" was not defined in Article V. However, § 910(l), in what was then the General Provisions Article, provided: "The word 'agency' when used to designate a subordinate element of government shall be construed as including all offices, departments, institutions, boards, commissions, and corporations of the County government and, when so specified, all offices, departments, institutions, boards, commissions, and corporations which receive or disburse County funds." In a letter, the County Superintendent of Schools expressed concern that the definition could be interpreted as applying to the Board and expressed the Board's view that it would not be "appropriate for us to be considered an agency of County government." The version of the

---

[10] Ordinarily, the views expressed by one member of the legislative body would not necessarily provide much insight into the intent of the entire body. *State v. Phillips*, 457 Md. 481, 488-89 (2018) ("The views expressed by individual members of the legislative (or Constitutional) body as part of the debate may be considered, subject to the critical caveat that those views may not have been shared by anyone else and, to that extent, may be irrelevant."). Here, however, Mr. Carson was one of just five members of the Charter Board, and his statements were made without contradiction while seated with at least three of the other members of the board in responding to questions raised about the draft charter at a public hearing.

26

Charter that was ultimately adopted included the definition of "County" now contained in § 502, perhaps to identify Article V as the "so specified" portion of the Charter in which all entities that receive or disburse County funds are to be treated as County agencies.

The legislative history of Charter § 207, alongside the plain language and context of the provision, is sufficient to rule out the possibility that the framers of the Charter would have viewed employees of the Board as County employees for purposes of that provision. It does not, however, resolve whether they would have viewed employees of the Board as State employees. Nor have the parties pointed us to any other indicia of legislative intent that provide a definite conclusion.

Considering the remaining unresolved ambiguity, we reach our resolution of the scope of Charter § 207 as applied to employees of the Board by invoking the canon of construction establishing "a presumption in favor of the eligibility of one who has been elected or appointed to a public office." *Green*, 144 Md. at 89; *see also Abrams*, 398 Md. at 179-80. As described succinctly in an Opinion of the Attorney General:

> Constitutional and statutory provisions that impose restrictions on the eligibility of a person to hold public office are construed liberally in favor of the eligibility of the person to hold the office. *See* 63C Am.Jur.2d *Public Officers and Employees* §53 at pp. 497-98 (observing that the case law generally holds that "[i]f there is any doubt or ambiguity in the applicable provisions, such doubt or ambiguity must be resolved in favor of eligibility"); *see also* 67 C.J.S. *Officers* §23 at pp. 175-76 ("The courts have a duty to liberally construe words limiting the right of a person to hold office"). The underlying basis for the presumption of eligibility is to favor the right of the voters to select their public officers. *Id.*

91 Op. Att'y 99, 103 (2006).

27

This Court applied the presumption in favor of eligibility in *Green*, in which the Circuit Court for Allegany County had found an individual ineligible to serve as clerk of Westernport, Maryland due to his service in the General Assembly when, the circuit court found, an increase in the salary for the clerk position "was virtually directed by [a] statute passed [by the General Assembly] during his legislative term." 144 Md. at 87. The circuit court issued a writ of mandamus removing the clerk from office. *Id.* at 89. This Court disagreed with the circuit court's interpretation of the effect of the relevant statute, and then stated:

> There is a presumption in favor of the eligibility of one who has been elected or appointed to a public office. 22 R. C. L. 400. Before his removal can be compelled by mandamus his constitutional or statutory disqualification should be clearly apparent. In this case the alleged ineligibility is not sufficiently demonstrated to require us to declare the appointment invalid. It will, therefore, be necessary to reverse the order for the writ of mandamus which directed the office to be vacated.

*Id.*[11]

The principle underlying the presumption in favor of candidate eligibility is that "[t]here is nothing more fundamental to our society than the ability of our electorate to choose its leaders." *Becker v. Dean*, 854 So. 2d 864, 869 (La. 2003); *see also id.* ("The purpose of the election process is to provide the electorate with a wide choice of candidates. . . . Thus, the interests of the state and its citizens are best served when election laws are interpreted so as to give the electorate the widest possible choice of candidates.");

---

[11] We also discussed the same presumption in *Abrams* but determined that it was inapplicable there because the constitutional provision in dispute was not ambiguous. 398 Md. at 179-80.

28

*In re Farnese*, 17 A.3d 357, 372 (Pa. 2011) ("[T]he Election Code must 'be liberally construed to protect a candidate's right to run for office and the voters' right to elect the candidate of their choice.'" (quoting *In re Nomination Petition of Driscoll*, 847 A.2d 44, 49 (Pa. 2004))); *State ex rel. Kelly v. Cuyahoga County Bd. of Elections*, 639 N.E.2d 78, 79 (Ohio 1994) ("Words limiting the right of a person to hold office are to be given a liberal construction in favor of those seeking to hold office, in order that the public may have the benefit of choice from all those who are in fact and in law qualified." (quoting *State ex rel. Schenck v. Shattuck*, 439 N.E.2d 891, 893 (Ohio 1982))); *Sears v. Bayoud*, 786 S.W.2d 248, 251 (Tex. 1990) ("We have repeatedly recognized the principle that constitutional provisions which restrict the right to hold public office should be strictly construed against ineligibility.").

In recognition of the public interest in strictly construing laws limiting eligibility for public office to protect the right of voters to choose their elected officials, we continue to adhere to the presumption in favor of eligibility when laws imposing restrictions are ambiguous. Applying that presumption here to resolve the ambiguity in Charter § 207, we hold that it does not preclude Mr. Bennett from serving as a member of the Council while maintaining his position as a public schoolteacher employed by the Board.

## II. THE DOCTRINE OF INCOMPATIBLE POSITIONS

The circuit court also determined that Mr. Bennett is barred from simultaneously serving as a member of the Council and an employee of the Board by the common law doctrine of incompatible positions. Under that doctrine, an individual cannot simultaneously hold two offices that are incompatible with each other. *Lilly v. Jones*, 158

Md. 260, 265-66 (1930); *see also Hetrich v. County Comm'rs of Anne Arundel County*, 222 Md. 304, 308 (1960). "The fundamental test of incompatibility . . . is whether there is a present or prospective conflict of interest, as where one office is subordinate to the other or subject to supervision by the other, or where the incumbent of one office has the power to appoint or remove or to set the salary of the other." *Hetrich*, 222 Md. at 308. Incompatibility is determined by "the character and relation of the offices," *id.* (quoting *Lilly*, 158 Md. at 266), and "whether there is a present or prospective conflict of interest," *Hetrich*, 222 Md. at 308. If an officer accepts two offices that are incompatible with each other, the officer generally must vacate the first one the officer accepted. *Id.*

*Hetrich* and *Lilly* are instructive as to when two offices are incompatible. In *Hetrich*, a Board of County Commissioners appointed one of its members to serve as the Acting County Business Manager. *Id.* at 307. The trial court concluded that the positions were incompatible. *Id.* at 306-07. This Court agreed, noting that, by statute: (1) the Board of County Commissioners had direct authority over the County Business Manager, including the power to appoint, remove, and set the salary for the position; and (2) the manager was "responsible to the board of county commissioners for the proper administration of all affairs of the county[.]" *Id.* at 308.

In *Lilly*, this Court held that service on the Baltimore City Service Commission and the Port Development Commission of Baltimore City, both appointments by the Mayor of Baltimore City, were incompatible. 158 Md. at 265-66. The Baltimore City Service Commission was responsible for classifying all municipal offices and positions in the City of Baltimore, including those of the Port Development Commission, and "no appointment

30

to any such offices or places [could] be made except under the rules of the" Baltimore City Service Commission. *Id.* at 262. In that way, "[t]he powers and duties of the Port Development Commission in the matter of appointments [we]re subject to the supervisory powers of the City Service Commission[.]" *Id.* at 266. The purpose of the division between the classification power of the Baltimore City Service Commission and the appointment power held by the various other entities in the City government was "to provide a merit system of appointment for the City of Baltimore." *Id.* at 262. In light of that, we held that "to permit one person to exercise the powers of both commissions would not only allow [that person] to exercise powers that are inconsistent, but would defeat the very object and purpose of the creation of the City Service Commission." *Id.* at 266.

Returning to the dispute before us, any possible conflict between the positions of Council member and public schoolteacher is too attenuated to run afoul of the doctrine of incompatible positions. In *Hetrich*, we identified two examples of "a present or prospective conflict of interest" that would fail the "fundamental test of incompatibility": (1) "where one office is subordinate to the other or subject to supervision by the other," or (2) "where the incumbent of one office has the power to appoint or remove or to set the salary of the other." 222 Md. at 308. Here, neither position is subordinate to or subject to supervision by the other. A teacher in the Harford County school system is subordinate to and subject to the supervision of the Board, the County Superintendent, and, presumably, the principal and other administrators in the school in which the teacher is placed. To the extent a teacher has a right to appeal certain decisions of the Board, such as those related to discipline, that right of appeal is to the State Board, not the Council. Educ. §§ 6-203, 6-202(a)(4); *see,*

31

*e.g.*, *Donlon*, 460 Md. at 70-73. The Council plays no role in any aspect of the supervision of Board employees.

Nor does the Council have the power to appoint, remove, or set the salary of a public schoolteacher employed by the Board. Rather, subject to the State Board's role in setting standards for teachers and certifying them, Educ. §§ 2-205(b), (c) & (g), 6-101, 6-202(c)(3), the County Superintendent and the Board in some combination hold the power to appoint, *id.* § 4-103(a), remove, *id.* § 6-202(a), and set the salary, *id.* §§ 4-103(a)(2), 6-201(f), of a public schoolteacher. The Council's role with respect to the Board's budget is also limited, constrained to approving or reducing broad categories of spending, one of which is *all* salaries of all teachers, administrators, and other personnel in the system. *Id.* §§ 5-102(b), 5-105(b). If the Council fails to approve the full amount requested in the Board's budget, it is for the Board to decide how to adjust its spending. *Id.* § 5-103(c). Simply put, the Council's role concerning the Board's overall budget does not provide it with any power to appoint, remove, or set the salary of an individual teacher.[12]

We also do not discern any incompatibility between the Council's limited role in the selection of members of the Board and employment as a public schoolteacher. The

---

[12] The parties included in the record an advice letter from Assistant Attorney General Kathryn M. Rowe opining that it would not "violate the common law doctrine of incompatibility of offices for a teacher in Carroll County to also serve as a County Commissioner." Assistant Attorney General Rowe observed that "[t]he County Commissioners do not have supervisory authority over teachers, do not set policy for the school system, and do not have the authority to hire or fire teachers." She further noted that the Commissioners' limited impact on the school system's budget, "and thus some possible impact on teachers['] salaries," was "too attenuated to create incompatibility between the positions." At least as applied to the facts here, we agree with that analysis.

32

Council must approve of the County Executive's selection of three of the nine voting members of the Board, whether for a full term or to fill a vacancy. *Id.* § 3-6A-01(d)(1)(ii) & (f)(2). And, in the case of a mid-term vacancy in any of the six elected seats on the Board, the Council may fill the vacancy "for the remainder of the term." *Id.* § 3-6A-01(f)(1). But neither of those responsibilities provides the Council with any supervisory authority over a public schoolteacher, or with the ability to hire, fire, discipline, or set the salary of such a teacher. The Council's role is simply too remote from the position of any individual teacher to violate the doctrine of incompatibility.[13]

Nor does any inherent incompatibility arise from the possibility that a public schoolteacher might favor policy decisions that enhance education in the County or provide additional funding for it, any more than a similar possibility that a business owner might favor policy decisions that enhance the business climate in the County or provide for additional spending on infrastructure that might benefit that individual's business. The doctrine of incompatible positions precludes service in roles that are specifically incompatible, such as the roles at issue in *Hetrich* and *Lilly*. It does not preclude service by individuals who might benefit generally or indirectly from the roles they fulfill. Indeed, by making residency in one's Council district a qualification for election, the Charter ensures the election of Council members who will be able to benefit generally from the Council's decisions.

---

[13] We offer no opinion concerning whether any applicable code of ethics would require Mr. Bennett to recuse himself from voting on any individual issue that may come before the Council during his tenure.

## CONCLUSION

In summary, we hold that Mr. Bennett was not barred by (1) Section 207 of the Harford County Charter or (2) the doctrine of incompatibility, from serving as a member of the Harford County Council while simultaneously employed as a teacher by the Harford County Board of Education.  For that reason, we reversed the declaratory judgment and order issued by the Circuit Court for Harford County entered on February 15, 2023 and remanded the case to the circuit court for entry of:  (1) a declaratory judgment that Mr. Bennett is qualified to serve as a member of the Harford County Council while being employed as a teacher by the Harford County Board of Education; and (2) any injunctive relief that may be necessary and appropriate to implement and enforce that declaratory relief.

Circuit Court for Harford County
Case No. C-12-CV-22-000857
Argued: April 4, 2023

IN THE SUPREME COURT

OF MARYLAND*

No. 38

September Term, 2022
_____

JACOB BENNETT

v.

HARFORD COUNTY, MARYLAND
_____

Fader, C.J.,
Watts,
Hotten,
Booth,
Biran,
Gould,
Eaves,

JJ.
_____

Dissenting Opinion by Gould, J.
_____

Filed: August 30, 2023

* During the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals to the Supreme Court of Maryland. The name change took effect on December 14, 2022.

The Majority Opinion reaches two conclusions. *First*, that the Harford County Charter ("Charter") section 207 does not preclude Mr. Bennett from serving on the Harford County Council ("Council") because, under the circumstances here, his employer, the Harford County Board of Education ("Board"), lacks the character or qualities of either a State or County government. *Second*, that the doctrine of incompatible positions does not preclude Mr. Bennett from serving as both a schoolteacher and a Council member simultaneously. I respectfully disagree with both conclusions.

**The Plain Language of Charter Section 207**

Section 207 of the Charter provides: "During the term of office, the Council member shall not hold any other office of profit or employment in the government of the State of Maryland, Harford County, or any municipality within Harford County, except a position held by virtue of being a Council member."

In construing section 207, the Majority focuses on the identity of the entity that employs Mr. Bennett, stating that section 207 "prohibits an individual from serving as a Council member if, among other things, the individual is *employed by the State of Maryland or the County*." Maj. op. at 7 (emphasis added). From that premise, the Majority surveys caselaw that addresses whether certain state statutes treat local boards of education as State or County governmental entities. *See Donlon v. Montgomery Cnty. Pub. Schs.*, 460 Md. 62 (2018) (holding county boards of education are state governmental entities for purposes of Maryland's Whistleblower Protection Law, Md. Code Ann., State Pers. & Pens. §§ 5-301–5-314 (1993, Repl. Vol. 2015)); *Beka Indus., Inc. v. Worcester Cnty. Bd. of Educ.*, 419 Md. 194 (2011) (holding county boards of education are state governmental

entities for purposes of sovereign immunity under Md. Code Ann., State Gov't § 12-201 (2014, Repl. Vol. 2021)); *Chesapeake Charter, Inc. v. Anne Arundel Cnty. Bd. of Educ.*, 358 Md. 129 (2000) (county boards of education are not state governmental entities for purposes of the General Procurement Law, Md. Code Ann., State Fin. & Proc. §§ 11-101(x), 11-202 (1985, Repl. Vol. 2021)). Respectfully, whether a particular State statute—which reflects only the intent of the General Assembly—applies to a local board of education tells us little about the meaning and intent behind section 207 of the Charter.

In my view, the Majority misconstrues section 207. Section 207 requires us to ask whether Mr. Bennett holds "employment *in the government of* the State of Maryland, Harford County, or any municipality within Harford County," (emphasis added), not which entity serves as his official employer. As a teacher in the County public school system, Mr. Bennett clearly holds employment in either the State or County government. That the Board—a creature of State statute that can be viewed as either a State or County entity depending on the circumstances—cuts Mr. Bennett's paycheck is beside the point.

Furnishing a free, public education system is a primary function of this State's government. Article VIII, Section 1 of the Maryland Constitution provides: "The General Assembly, at its First Session after the adoption of this Constitution, shall by Law establish throughout the State a thorough and efficient System of Free Public Schools; and shall provide by taxation, or otherwise, for their maintenance." The General Assembly carried out this mandate by enacting the statutes contained in the Education Article. This Court has previously described the constitutional and statutory framework as establishing a "shared responsibility between State and local governments for public school education

and emphasizing the need for a measure of local control and initiative." *Hornbeck v. Somerset Cnty. Bd. of Educ.*, 295 Md. 597, 630 (1983). Importantly, when we made that statement, we relied on sources that predated the 1972 adoption of the Charter. *Id.* & n.9 (citing Green Comm'n, Report of Maryland Commission to Re-Study and Re-Evaluate the Philosophy and Practices of the Finances of the Public Schools (1962); Hughes Comm'n, Report of Senate Committee on Taxation and Fiscal Matters (1963); and Hughes Comm'n, Report of the Commission to Study the State's Role in Financing Public Education (1971)). The framers of the Charter presumably understood the shared responsibility between the governments of the County and the State in providing for and funding Harford County public schools. The Charter's various provisions should be construed in that light.

As a teacher in Harford County's public school system, Mr. Bennett is on the frontlines in executing a specific governmental function for which both the State and County governments share responsibility. That the General Assembly chose to implement its constitutional mandate by creating local boards of education that serve as the official employers of public school teachers does not obscure the governmental nature of Mr. Bennett's job as a teacher. The General Assembly could change the structure of the public school system at any time, but Mr. Bennett's role as a teacher in the government-established and government-funded school system would remain unchanged. One way or the other, Mr. Bennett is employed "in" either the State or County government. The Majority's exercise in characterizing the nature of the entity that formally employs Mr. Bennett—which is merely an instrument devised by the General Assembly to implement its constitutional mandate—misses the forest for the trees.

3

**Charter Section 502**

The Charter certainly treats Mr. Bennett as a County employee. Section 502 provides a list of "[d]efinition[s] of terms used in this article." There, "County" or "County government" is defined to "include all agencies and their officers, agents, and employees who receive or disburse County funds." Charter § 502(a). It then defines "County funds" as "any monies appropriated or approved by the Council or to which the County may at any time have legal or equitable title." Charter § 502(b).

The Majority acknowledges that "[a]s a recipient of County funds, the Board falls squarely within [section 502's definition of County government]," but dismisses the relevance of that provision to section 207 because of "both (1) the express limitation on the scope of that definition to the provisions of Article V and (2) the much different scope of County government agencies identified in Article IV." Maj. op. at 23. I respectfully disagree with the Majority on both fronts.

*First*, nothing in section 502 can be properly characterized as an "express limitation on the scope" of the definitions set forth therein. The language on which the Majority relies is found exclusively in the *title* of section 502, which reads in full: "Section 502. Definition of terms used in this article." That language does not constitute an "express limitation on the scope" of section 502's definitions. Rather, that language, combined with the definitions that follow in section 502, provides the reader with interpretive tools to make sense out of words and phrases that are repeatedly used in Article V, which is entitled "Budget and Finance." Relevant here, "County" or "County government" is used 65 times

4

in the subsequent provisions of Article V. So, it makes sense that the framers saw fit to define those words in that Article.

But that doesn't render irrelevant such definitions for the purposes of section 207. To the contrary, the sweeping breadth of section 502's definition of "County" or "County government" to include any entity or person who receives any funding from the County is entirely consistent with the sweeping breadth of section 207's prohibition of Council members from holding "*any* other office of profit or employment *in* the government of the State of Maryland, Harford County, or any municipality within Harford County[.]" (emphasis added). Absent express language in either section 207 or section 502 requiring otherwise, these sections of the Charter should be construed in harmony, which means that employment "in" County government under section 207 would include any person considered a County employee under section 502. *See O'Connor v. Baltimore County*, 382 Md. 102, 113 (2004) ("Local ordinances and charters are interpreted under the same canons of construction that apply to the interpretation of statutes."); *Moore v. RealPage Util. Mgmt., Inc.*, 476 Md. 501, 512 (2021) ("The Court presumes that the Legislature intends its enactments to operate together as a consistent and harmonious body of law, and, therefore, attempts to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope." (internal quotation marks omitted) (quoting *State v. Johnson*, 415 Md. 413, 421–22 (2010)).

*Second*, the Majority's reliance on Article IV is misplaced. Starting from the premise that the Board is an agency, the Majority notes that section 401 places *all* agencies of the County government under the control of the County Executive. Thus, according to

5

the Majority, if the Board is intended by the Charter to be a County agency, one would expect to find the Board on the list of the agencies under executive branch control. The Majority notes that the list of such agencies is found in section 402, and the Board is not on it. The Majority reasons that this indicates that the framers did not intend for the Board to be considered a County agency. The Majority sees this tension between sections 401 and 402—which *don't* include the Board as part of the County government—with the definition of County government in section 502—which does *include* the Board—as an indication that the definitions in section 502 were meant to be cabined to Article V, and not applicable elsewhere in the Charter.

The problem with the Majority's reasoning is that it doesn't give meaning to the prefatory words of section 401, which provides that "[e]xcept as otherwise provided in this Charter or in state law, all agencies of the County government shall be subject to the direction, supervision, and control of the County Executive." The phrase "[e]xcept as otherwise provided in this Charter or in state law" is critical. It means that, if provided elsewhere in the Charter or otherwise in State law, an agency *can* be part of the County government even if it is *not* under the control of the executive branch. And, in section 502, the Charter *does* otherwise provide that the Board is part of the County government and that a teacher is employed in the County government. Thus, by the plain language of section 401, any tension between section 401 and section 502 is resolved in favor of the latter. Sections 401 and 402 are not, therefore, impediments to construing sections 207 and 502 together.

6

In sum, when section 207 is read in conjunction with section 502, Mr. Bennett's status as a teacher means that he holds employment in the County government and is thus ineligible to serve as a member of the Council. I would hold, therefore, that so long as Mr. Bennett remains employed as a teacher in the County public school system, he is ineligible to serve as a Council member. Accordingly, I would affirm the circuit court's judgment on that basis.

### The Doctrine of Incompatible Positions

The Majority correctly states:

> Under [the doctrine of incompatible positions], an individual cannot simultaneously hold two offices that are incompatible with each other. . . . "The fundamental test of incompatibility . . . is whether there is a present or prospective conflict of interest, as where one office is subordinate to the other or subject to supervision by the other, or where the incumbent of one office has the power to appoint or remove or to set the salary of the other." . . . Incompatibility is determined by "the character and relation of the offices," . . . and "whether there is a present or prospective conflict of interest[.]" . . . If an officer accepts two offices that are incompatible with each other, the officer generally must vacate the first one the officer accepted.

Maj. op. at 29-30 (internal citations omitted).

In my view, the positions of teacher and Council member meet this test of incompatibility. As the Majority acknowledges, the Board wields considerable power in appointing, removing, and setting the salaries of teachers. The Board also has considerable input in setting the Board's budget. The Council, in turn, has a significant role in choosing the members of the Board. Indeed, the Council has veto authority over three of the nine Board members appointed by the County Executive. Md. Code Ann., Educ. § 3-6A-01(d)(1)(ii) (2008, 2022 Repl. Vol.). Presumably, the General Assembly

7

determined that such veto authority would have a meaningful impact on the constitution of the Board.

Because a teacher's salary and working conditions are determined in large part by the Board, and the Council plays a material role in the selection of the Board members, it seems obvious that the position of Council member is incompatible with the position of a teacher. Think of it this way: if each Council member were a teacher in a County public school, those teachers would have a significant role in selecting the teachers' negotiating counterparts in setting teacher compensation. The potential for a conflict of interest is, in my view, readily apparent. As such, I would affirm the circuit court on that basis as well.

Accordingly, I respectfully dissent.